# 26-1225

## United States Court of Appeals
## for the Second Circuit



RONALD KRICK, Individually and on Behalf of the Estate of Oliver Krick,
MARGARETA KRICK, CHRISTOPHER KRICK, DOUGLAS KEVORKIAN,
Individually and on Behalf of the Estate of Ralph Kevorkian, CHRISTINE
GROGAN, EILEEN ZAHARIOUDAKIS, Individually and Behalf of the Estate
of Donald Gough, MICHAEL DETERESA, CHARLES HENRY GRAY IV,
CHADWICK GRAHAM GRAY, CRAIG GAETKE, WANDA KEMP,
Individually and on Behalf of the Estates of O. Lamar Allen and Ashton Allen,

*Plaintiffs-Appellants,*

LISA MICHELSON, Individually and on Behalf of the Estate of Yonatan
Rojany, ERIC ROJANY, JODELLE GEARON, Individually and on
Behalf of the Estate of Daniel Gaetke, TODD GAETKE,

*Plaintiffs,*

v.

RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION,
LOCKHEED MARTIN CORPORATION, UNITED STATES MISSILE
DEFENSE AGENCY, UNITED STATES DEPARTMENT OF DEFENSE,
UNITED STATES NAVY, UNITED STATES OF AMERICA,

*Defendants-Appellees,*

DOES 1 THROUGH 20,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPELLANTS' BRIEF

T.M. GUYER AND
AYERS & FRIENDS, PC
*Attorneys for Plaintiffs-Appellants*
P.O. Box 1061
Medford, Oregon 97501
(202) 227-3590
*thad@guyerayers.com*

**DICK BAILEY**
EST. 1966
www.dickbailey.com

## CORPORATE DISCLOSURE STATEMENT

Appellants are natural persons. No Appellant is a corporation, and no Appellant issues stock. Federal Rule of Appellate Procedure 26.1 therefore requires no disclosure.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES PRESENTED.........................................1

STATEMENT OF THE CASE..................................................................2

    A.  The crash, the official internal-malfunction narrative, and the prior aviation-death settlements. ................................................................3

    B.  The alleged removal, withholding, and concealment of evidence .................6

    C.  The present action and the district court's release ruling. ...............................8

    D.  The withdrawal of Appellants' counsel and the order under review .............11

SUMMARY OF THE ARGUMENT .........................................................13

ARGUMENT .........................................................................................14

I.   THE DISTRICT COURT ERRED IN TREATING THE BREADTH OF THE 2000–2001 RELEASES AS DISPOSITIVE WITHOUT CONDUCTING THE INTENT AND "FAIRLY AND KNOWINGLY MADE" INQUIRIES NEW YORK LAW REQUIRES. ........................................................14

    A.  Standard of Review.........................................................................14

    B.  A general release bars unknown fraud claims only where the release was fairly and knowingly made and the parties so intended, inquiries independent of the release's literal breadth..................................................16

    C.  The complaint does not establish, at the pleading stage, that the releases were fairly and knowingly made as to the concealed cover-up. ...................18

    D.  The complaint alleges fraud separate from the subject of the releases ........22

    E.  The district court never decided the scope-and-intent questions Mangini requires as to the alleged cover-up. .........................................................24

F.   The releases' no-reliance disclaimer does not bar the claims at the pleading stage. ........................................................................................26

II.  THE RELEASES' UNKNOWN-CLAIMS AND SUBSEQUENTLY-DISCOVERED-FACTS LANGUAGE DOES NOT ESTABLISH, AT THE PLEADING STAGE, AN INTENT TO RELEASE THE CONCEALED FRAUD..............................................................................................30

III. THE DISTRICT COURT ERRED IN AFFIRMING THE ORDER PERMITTING APPELLANTS' COUNSEL TO WITHDRAW. ......................33

A.   Standard of Review..............................................................................33

B.   The Withdrawal Motion was Dispositive in Practical Effect, and the District Court Reviewed It Under The Wrong Standard...............................33

C.   The order permitted withdrawal without the showing Local Civil Rule 1.4 requires as to the posture of the case. ......................................................35

D.   The Withdrawal Caused Continuing Prejudice that Substitute Appellate Counsel Did Not Cure ....................................................................36

E.   Effective Relief Remains Available Because the Withdrawal Order Will Govern the Litigation On Remand. .............................................................37

F. The errors are not cured by the forfeiture findings..........................................37

IV. THE DISMISSAL ON THE STANDING GROUND CANNOT STAND AS ENTERED, BECAUSE RULE 17(a)(3) FORBADE DISMISSAL BEFORE A REASONABLE TIME TO CURE AND THE DISMISSAL SHOULD IN ANY EVENT HAVE BEEN WITHOUT PREJUDICE...................................39

A.   Standard of Review..............................................................................39

B.   The defect the court identified is one of capacity and real-party-in-interest status, not an absence of Article III standing....................................39

C.   Rule 17(a)(3) forbade dismissal before a reasonable time to cure, and Appellants asked for that time. ................................................................40

D.   At a minimum, the dismissal should have been without prejudice. ..............41

CONCLUSION....................................................................................................44

CERTIFICATE OF COMPLIANCE...................................................................45

CERTIFICATE OF SERVICE ..........................................................................46

iii

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997) ..............41

*Alleghany Corp. v. Kirby*, 333 F.2d 327 (2d Cir. 1964) ..............23

*Bank of Am. Nat'l Trust & Sav. Ass'n v. Gillaizeau*,
766 F.2d 709 (2d Cir. 1985) ..............14

*Barrett v. United States*, 622 F. Supp. 574 (S.D.N.Y. 1985) ..............21

*Barrett v. United States*, 689 F.2d 324 (2d Cir. 1982)..............21

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
757 F.2d 523 (2d Cir. 1985) .............. 19, 22-24

*Bellefonte Reinsurance Co. v. Argonaut Ins. Co.*,
581 F. Supp. 241 (S.D.N.Y. 1984) ..............19

*Carrick v. Cent. Gen. Hosp.*, 51 N.Y.2d 242 (1980) ..............42

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016) .............. 41-42

*Centro Empresarial Cempresa S.A. v. América Móvil,
S.A.B. de C.V.*, 17 N.Y.3d 269 (2011) .............. 15-16, 18-19, 22-24, 29-31

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
76 A.D.3d 310 (1st Dep't 2010)..............18

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178 (S.D.N.Y.
2008) ..............32

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)..............33

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317 (1959) ..............27

*DDJ Mgt., LLC v. Rhone Group L.L.C.*, 15 N.Y.3d 147 (2010) ..............16, 28

*DIRECTV Grp., Inc. v. Darlene Invs., LLC*,
No. 05 Civ. 5819, 2006 WL 2773024 (S.D.N.Y. Sept. 27, 2006)..............32

*Frometa v. Mar-Can Transp. Co.*, 72 Misc. 3d 316 (N.Y. Sup. Ct. 2021) ..............43

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021) .............. 39-40

*Golden Pac. Bancorp v. FDIC*, 273 F.3d 509 (2d Cir. 2001) ..............14

*Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121 (2d Cir. 1999)..............41

*Holt v. Alleghany Corp.*, 384 U.S. 28 (1966) ..............23

*Irving Trust Co. v. Deutsch*, 73 F.2d 121 (2d Cir. 1934)..............23–24

*Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294 (2d Cir. 1965).............. 42-43

*Krick v. Raytheon Co.*, 695 F. Supp. 3d 202 (D. Mass. 2023) ................ 9, 20, 28-29

*Krick v. Raytheon Co.*, 822 F. Supp.
    3d 306 (E.D.N.Y. 2026) ..................................................................................... 4-5

*Mangini v. McClurg*, 24 N.Y.2d 556 (1969) ............................ 15, 17, 20, 24-26, 31

*McIntyre v. United States*, 367 F.3d 38 (1st Cir. 2004) ............................................29

*Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993) ...........................27

*Moore v. Cohen*, 548 F. Supp. 3d 330 (S.D.N.Y. 2021) .........................................30

*Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014) ..................................................... 14-15

*Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1 (1st Cir. 1999) .........................34

*Rajaratnam v. Moyer*, 47 F.3d 922 (7th Cir. 1995) ................................................34

*Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013) ...............40

*Wade Park Land Holdings, LLC v. Kalikow*,
    589 F. Supp. 3d 335 (S.D.N.Y. 2022) .......................................................32

*Whiting v. Lacara*, 187 F.3d 317 (2d Cir. 1999) ...............................................33, 35

*Williams v. Beemiller, Inc.*, 527 F.3d 259 (2d Cir. 2008) .......................................33

**Statutes and Rules**

28 U.S.C. § 636(b)(1)(A) .................................................................................... 33-34

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1332 ........................................................................................................1

28 U.S.C. § 1346(b)(1) ..............................................................................................1

28 U.S.C. § 1367 ........................................................................................................1

28 U.S.C. § 2671 ........................................................................................................1

CPLR 3211 ...............................................................................................................29

CPLR 205(a) .............................................................................................................42

Fed. R. App. P. 4(a)(1)(B) .........................................................................................1

Fed. R. App. P. 32(a)(5), (6), (f) ..............................................................................45

Fed. R. Civ. P. 12(b)(1) .............................................................................................2

Fed. R. Civ. P. 12(b)(6) .............................................................................................2

Fed. R. Civ. P. 17(a)(3) ..........................................................2, 10, 39, 40-41, 43-44

Fed. R. Civ. P. 72(a) .......................................................................................12, 33, 38

2d Cir. Local Rule 31.2(b)(1) ....................................................................................2

2d Cir. Local Rule 32.1(a)(4)(A) .............................................................................45

E.D.N.Y. Local Civil Rule 1.4 .............................................................. 14, 35-38, 44

v

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over Appellants' claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671 et seq., and over Appellants' related claims against the remaining Appellees under 28 U.S.C. §§ 1332 and 1367.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court granted Appellees' motions to dismiss on March 2, 2026 (ECF No. 227) and entered a final judgment dismissing all claims on March 3, 2026 (ECF No. 228). Appellants filed a notice of appeal on April 30, 2026 (ECF No. 229). Because the United States is a party, the notice of appeal was timely under Federal Rule of Appellate Procedure 4(a)(1)(B), which allows sixty days from entry of judgment. The notice of appeal designates two items: the March 3, 2026 judgment (ECF No. 228) (SPA26), and the November 20, 2024 order denying Appellants' appeal of the withdrawal order (ECF No. 159) (SPA27). The March 2, 2026 memorandum decision and order (ECF No. 227) (SPA1) merges into the judgment and is reviewable on this appeal.

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court erred in holding the 2000–2001 settlement releases dispositive and dismissing Appellants' claims without conducting the intent and "fairly and knowingly made" inquiries New York law requires before a general release may bar unknown, allegedly concealed fraud claims.

2. Whether the district court erred in affirming the magistrate judge's order permitting Appellants' counsel to withdraw.

3. Whether the district court erred in dismissing on the ground that Appellants are not duly appointed personal representatives, where Federal Rule of Civil Procedure 17(a)(3) forbids dismissal before a reasonable time has been allowed to ratify, join or substitute, and where the dismissal should in any event have been without prejudice.[1]

## STATEMENT OF THE CASE

This appeal arises from the pleading-stage dismissal of claims brought by family members and estate representatives of passengers killed aboard TWA Flight 800. The district court accepted the complaint's well-pleaded allegations as true, including allegations that government actors removed, withheld, and concealed evidence bearing on the cause of the crash. *Krick v. Raytheon Co.*, 822 F. Supp. 3d 306, 312-13 (E.D.N.Y. 2026) (SPA2 to SPA3); SAC ¶¶ 1-7, 40, 83-100 (JA98 to JA100, JA105, JA113 to JA116); ECF No. 196 at 25-26, 33-34 (JA412 to JA413,

---

[1] Appellants press the issues stated above. The district court dismissed on two independent grounds: it held that Appellants lack standing, SPA10 to SPA13, and held in the alternative that even assuming those deficiencies could be cured, the settlement releases bar the claims, SPA12. It expressly declined to reach Appellees' remaining grounds for dismissal. SPA25 n.18. Issue III addresses the first ground. Appellants do not waive, abandon or concede the grounds the court did not reach, and will address them in reply if Appellees press any of them. This appeal is on the Court's Expedited Appeals Calendar, which is reserved for appeals from threshold dismissals under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). 2d Cir. LR 31.2(b)(1); Dkt. 44. The grounds the district court declined to reach are not part of the threshold disposition under review, and briefing them here would enlarge the appeal beyond it.

2

JA420 to JA421). The court nevertheless held that settlement releases executed in earlier aviation-death litigation barred the present action as a matter of law. 822 F. Supp. 3d at 318-25 (SPA13 to SPA25).

The release issue turns on the distinction between the aviation-death claims resolved in 2000–2001 and the subsequently discovered evidence-concealment allegations asserted here. The releases addressed the destruction of TWA Flight 800, the deaths of those aboard, and the aviation-loss claims settled in the multidistrict litigation. The complaint alleges that government actors and others later removed, withheld, concealed, or altered material evidence concerning the cause of the disaster and that the families did not know those facts when they executed the releases.

**A.** **The Crash, the Official Internal-Malfunction Narrative, and the Prior Aviation-Death Settlements.**

On July 17, 1996, TWA Flight 800, a Boeing 747 bound for Paris, departed John F. Kennedy International Airport. Approximately twelve minutes after takeoff, while over the Atlantic Ocean off Long Island, the aircraft broke apart and crashed. All 230 passengers and crew members aboard were killed. 822 F. Supp. 3d at 312 (SPA2); SAC ¶¶ 2, 34, 36-37 (JA99, JA104).

The crash led to investigations by the National Transportation Safety Board ("NTSB") and the Federal Bureau of Investigation ("FBI"). 822 F. Supp. 3d at 312 (SPA2); SAC ¶¶ 38-39 (JA104). The complaint alleges that the FBI took charge of

3

the investigation and enlisted the Central Intelligence Agency ("CIA"). 822 F. Supp. 3d at 312 (SPA2); SAC ¶ 39 (JA104). Eyewitnesses reported seeing something arcing toward TWA 800 before the aircraft erupted into flames and fell from the sky, and the complaint alleges that eyewitnesses interviewed by the FBI later recalled being threatened. 822 F. Supp. 3d at 312 (SPA2); SAC ¶¶ 41-46 (JA105 to JA106).

The government's public explanation became that the crash was not caused by a missile, but by an explosion in the aircraft's center fuel tank. At a nationally televised FBI press conference, the CIA presented a video entitled "What Did The Eyewitnesses See?," which attempted to reconcile eyewitness reports of a projectile with the government's conclusion that a fuel-tank defect caused the crash. 822 F. Supp. 3d at 312-13 (SPA3); SAC ¶¶ 47-48 (JA106). The video displayed the words "NOT A MISSILE." SAC ¶ 48 (JA106). The NTSB later issued a report stating that the probable cause was an explosion of flammable vapors in the center fuel tank. 822 F. Supp. 3d at 312-13 (SPA3); SAC ¶ 50 (JA107). According to the complaint, the NTSB's Office of Families advanced the fuel-tank explanation while dismissing the missile explanation as a conspiracy theory. 822 F. Supp. 3d at 312-13 (SPA3); SAC ¶¶ 51-52 (JA108).

Against that official narrative, families of passengers aboard TWA Flight 800 pursued aviation-death claims in the multidistrict litigation against Boeing, TWA, and Hydro-Aire, the manufacturer of the aircraft's fuel system. See 822 F. Supp. 3d

at 318 (SPA13); *Krick v. Raytheon Co.*, 695 F. Supp. 3d 202, 208 n.1 (D. Mass. 2023). In 2000 and 2001, before the later FOIA disclosures alleged in this case, certain Appellants or their predecessors executed settlement releases resolving claims arising from the crash and deaths. 822 F. Supp. 3d at 320-21 (SPA17 to SPA19); ECF Nos. 187-3 to 187-9 (JA315 to JA387; execution dates at JA321 to JA322, JA331, JA340 to JA341, JA348, JA355 to JA356, JA364 to JA365, JA386 to JA387).

The releases defined the crash as the "Event." See, e.g., ECF No. 187-3 ¶ 1 (JA316). They released claims that Releasors "ever had, now have or hereafter can, shall or may have" against the Releasees "for, upon, by reason of, arising out of, or in any way related to the Event," including wrongful-death and survival claims and claims for past and future economic and noneconomic damages. 822 F. Supp. 3d at 323-24 (SPA22); ECF No. 187-3 ¶ 3 (JA316 to JA317). The releases also stated that subsequently discovered facts or greater-than-known damages would not defeat the releases as to "losses, injuries or damages arising out of the injury to or death of Decedent." 822 F. Supp. 3d at 324 (SPA23); ECF No. 187-3 ¶ 8 (JA318). Paragraph 9 provided that the Releasors did not rely on statements or representations by any Releasee concerning, among other things, "[t]he cause or causes for the Event" or "[t]he legal liability of any Releasee." 822 F. Supp. 3d at 325 (SPA24); ECF No. 187-3 ¶ 9 (JA319).

**B.** **The Alleged Removal, Withholding, and Concealment Of Evidence.**

The present action rests on allegations discovered after the releases were executed: that the official internal-malfunction explanation was accompanied by evidence removal, suppression, and concealment that prevented Appellants from discovering the basis for the claims asserted here.

The complaint alleges that, immediately after the crash, the FBI placed Navy radar tapes outside the NTSB's reach and did not permit the NTSB to interview eyewitnesses or review FBI records concerning the "true cause of the TWA 800 crash." 822 F. Supp. 3d at 312 (SPA2); SAC ¶ 40 (JA105). The complaint further alleges that FBI records later obtained through FOIA described radar evidence showing an object "heading straight for TWA 800" and an object on radar "impact[ing]" TWA 800. 822 F. Supp. 3d at 313 (SPA4); SAC ¶¶ 84, 91-92 (JA113 to JA114). According to the complaint, those records were not made part of the NTSB investigation, were not released to the public, and were not provided to the families of those killed in the crash. 822 F. Supp. 3d at 313 (SPA4); SAC ¶¶ 84-85 (JA113).

The complaint also alleges that Dr. Thomas Stalcup, through years of FOIA litigation, deposed government witnesses concerning the radar evidence. 822 F. Supp. 3d at 313 (SPA4); SAC ¶¶ 88-89 (JA114). One witness testified that, within minutes of the crash, he was ordered to allow the FBI to remove from his facility all

6

Navy radar tapes that might have recorded the incident. 822 F. Supp. 3d at 313 (SPA4); SAC ¶¶ 88-89 (JA114). According to records obtained in the FOIA litigation, those tapes showed an object "impact" TWA 800, a description the complaint alleges was inconsistent with the public conclusion that the crash was not caused by a missile. 822 F. Supp. 3d at 313 (SPA4); SAC ¶ 92 (JA114).

The complaint further alleges that the FOIA process began years after the releases were executed. In March 2010, Dr. Stalcup submitted FOIA requests to the CIA and the Department of Defense seeking information concerning the TWA 800 investigation and government missile activity in the relevant period. 822 F. Supp. 3d at 313 (SPA3 to SPA4). The ensuing FOIA litigation produced records that Appellants allege had not been provided to the NTSB, the public, or the families. 822 F. Supp. 3d at 313 (SPA4); SAC ¶¶ 83-85 (JA113). Appellants allege that they first learned the key facts compiled by Dr. Stalcup in April 2021. SAC ¶ 97 (JA115).

Appellants also identified evidence of spoliation in opposing dismissal below. Their opposition argued that "the deliberate spoliation of evidence, concealment of radar data, and DoD's decades-long denial campaign form a compelling basis for denying Defendants' Motions to Dismiss and allowing discovery to proceed," and identified "new findings of spoliation of the fuselage obtained during a joint inspection of the TWA 800 reconstruction in 2023 by the family member Plaintiffs in this action, alongside the Defendants, where a key fuselage component was found

7

to have been altered in a manner to conceal a feature consistent with the effects of a missile blast wave beneath the plane, precisely where the aircraft broke in half in midair." ECF No. 196 at 21 (JA408) & n.32.

Those allegations are central to the release question. Appellants allege that, when the releases were executed in 2000–2001, they did not know of the Navy radar-tape evidence, the alleged removal of those tapes from the NTSB's reach, or the FOIA records describing an object heading toward and impacting TWA 800. They further allege that the information remained inaccessible because material evidence was removed, withheld, or concealed by particular government actors, and that possible alteration of physical evidence was discovered during a 2023 joint inspection of the aircraft reconstruction.

### C. <u>The Present Action and the District Court's Release Ruling.</u>

Appellants filed this action in the District of Massachusetts on June 28, 2022, asserting claims against Raytheon Company, Lockheed Martin Corporation, the United States, and Doe defendants. 822 F. Supp. 3d at 313-14 (SPA4 to SPA5); ECF No. 1. The complaint alleges that the crash was caused not by a fuel-tank defect, but by a missile-system event involving the United States and its contractors, and that Appellants were prevented from discovering the basis for their claims by the alleged removal, suppression, and concealment of evidence. 822 F. Supp. 3d at 312-13 (SPA2 to SPA4); SAC ¶¶ 1-7, 83-100 (JA98 to JA100, JA113 to JA116).

8

The defendants moved to dismiss. The District of Massachusetts denied the motions without prejudice and transferred the action to the Eastern District of New York. *Krick*, 695 F. Supp. 3d at 220. After transfer, Appellees obtained the settlement releases from the earlier aviation litigation and invoked them in their motions to dismiss. 822 F. Supp. 3d at 314, 318-19 (SPA5 to SPA6); ECF Nos. 187-3 to 187-9 (JA315 to JA387); JA146; JA214; JA252.

Appellants opposed dismissal, arguing that the releases resolved crash-related claims and did not bar claims based on a later-discovered course of concealment and suppression of evidence. ECF No. 196 at 24-27, 38-39 (JA411 to JA414, JA425 to JA426); ECF No. 220 at 1-6 (JA470 to JA475). Appellants also objected that Defendants sought dismissal on a broad release theory while resisting discovery into the releases' scope and validity, and requested limited discovery so the release issues could be resolved on a complete evidentiary record. ECF No. 220 at 1-2, 12-13 (JA470 to JA471, JA481 to JA482).

The district court granted the motions to dismiss on two independent grounds. It held that Appellants lack standing "regardless of the applicable standard," because the complaint does not allege that they were duly appointed personal representatives of the decedents' estates. 822 F. Supp. 3d at 316-18 (SPA10 to SPA13). It then held that "[e]ven assuming that the plaintiffs could cure these deficiencies," the settlement releases bar the claims. Id. at 318 (SPA12). The release holding is not

9

confined to any subset of Appellees; the court dismissed the action in its entirety and reached no other ground. Id. at 325 (SPA25) & n.18. The court held that the releases were general releases governed principally by New York law and that they applied to Appellants and to the defendants in this action. 822 F. Supp. 3d at 321-22 (SPA18 to SPA20). It then held that the releases barred the present claims because they covered claims "arising out of, or in any way related to" TWA Flight 800, contemplated subsequently discovered facts, and contained disclaimers of reliance on statements or representations concerning the cause of the Event. Id. at 323-25 (SPA22 to SPA24). The court concluded that Appellants had not alleged fraud separate from the subject of the releases. Id. at 325 (SPA25).

On the standing ground, the court found that the complaint does not allege that Appellants were appointed to serve as executors, administrators or personal representatives, or that they received letters of administration, and that most of the estates had been closed by the early 2000s. 822 F. Supp. 3d at 316-18 (SPA10 to SPA12). Appellants answered that O. Lamar Allen's estate had never closed, that Oliver Krick's estate had been reopened, and that the remaining estate Appellants had filed petitions to reopen and were awaiting court dates; they argued that any such defect is "readily curable under FRCP 17(a)(3)." Id. at 317-18 (SPA12); ECF No. 196 at 21-22 (JA408 to JA409). The court recorded that argument and did not

10

address it. The order reopening Oliver Krick's estate was signed on July 15, 2025. SPA12 n.11.

In doing so, the district court treated the releases' reference to the "Event" and to the "cause or causes for the Event" as encompassing Appellants' allegations that government actors and others removed, suppressed, and concealed evidence concerning the cause of the crash. 822 F. Supp. 3d at 324-25 (SPA24 to SPA25). The court did not separately analyze whether the crash itself and the alleged decades-long Coverup were distinct subjects for purposes of the releases. Nor did it separately analyze whether alleged physical removal, withholding, or concealment of evidence constituted "statements or representations" within the meaning of Paragraph 9. Having found the releases dispositive, the court did not reach Appellees' remaining grounds for dismissal. Id. at 325 n.18 (SPA25).

## D. The Withdrawal of Appellants' Counsel and the Order Under Review.

While Appellees prepared their motions to dismiss, Appellants' counsel moved to withdraw. At an August 22, 2024 status conference the magistrate judge stated that he was "inclined to grant th[e] motion[ to withdraw]," and told Appellants that when that happened "their claims may inherently be extinguished." SPA34 (quoting Transcript of Aug. 22, 2024 Status Conference 18:20-19:12, ECF No. 149). Two months earlier, at the June 24, 2024 conference, ten days after Appellants' counsel moved to withdraw on June 14, 2024, Appellees had described the argument

11

their motions would share: "all of them will share in common the issue that the plaintiffs released everybody from any possible suit known or unknown in the future in signing these releases." SPA28.

The magistrate judge granted the motion on October 8, 2024, finding "insurmountable differences [] between counsel and client." SPA29. In doing so he relied on Appellants' disagreement with counsel's proposed course, their stated preference for litigating the merits, their emails to chambers, and the fact that they were "relying on legal advice from an attorney in Oregon" who had "declined to appear on behalf of the remaining plaintiffs." SPA30. On October 21, 2024, substitute counsel appeared "solely and strictly" for the purpose of appealing that order. SPA30.

Appellants objected to the district court. The court treated the withdrawal order as a non-dispositive pretrial matter, reviewed it for clear error under Federal Rule of Civil Procedure 72(a), and affirmed on November 20, 2024. SPA31 to SPA32; SPA36. It declined to reach several of Appellants' objections on the ground that they had not been raised before the magistrate judge. SPA33; SPA35 n.10.

On December 16, 2024, substitute counsel appeared for all Plaintiffs. ECF No. 165 (JA49). Appellees filed the motions to dismiss on April 1, 2025. ECF No. 179 (JA136); ECF No. 182 (JA244); ECF No. 186 (JA186). Each invoked the settlement releases. JA146; JA252; JA214.

12

This appeal followed.

## SUMMARY OF THE ARGUMENT

I. The district court treated the breadth of the 2000–2001 releases as resolving whether the parties intended to release the claims asserted here and whether the releases were fairly and knowingly made. New York law requires a fact-sensitive inquiry into both questions. The complaint alleges that the families were given an official explanation rejecting a missile cause and were prevented from discovering evidence supporting a contrary theory. It also alleges a course of evidence removal, concealment, and possible alteration distinct from the aviation-death claims resolved in 2000–2001. The release language was relevant to intent, but it did not eliminate the need to consider the pleaded circumstances surrounding execution. Nor did Paragraph 9 establish on the pleadings that Appellants knowingly disclaimed reliance concerning evidence allegedly withheld by particular government actors. These issues required a factual inquiry, and the requested limited discovery would have developed the relevant evidence concerning intent, knowledge, and the circumstances of execution.

II. The district court also erred in affirming the magistrate judge's order permitting Appellants' counsel to withdraw. The motion was treated as a non-dispositive pretrial matter and reviewed only for clear error, although the magistrate judge advised Appellants on the record that granting it might mean their claims "may

13

inherently be extinguished." An order carrying that practical effect is functionally equivalent to a dismissal and was owed de novo review. Local Civil Rule 1.4 separately conditions withdrawal on a showing as to the posture of the case, and the posture finding rested on the premise that dispositive motion practice had not begun, when the release defense that ended the action had already been previewed to the court two months earlier. Neither error is answered by the forfeiture findings. The November 20, 2024 order should be vacated and the matter remanded.

ARGUMENT

I. **THE DISTRICT COURT ERRED IN TREATING THE BREADTH OF THE 2000–2001 RELEASES AS DISPOSITIVE WITHOUT CONDUCTING THE INTENT AND "FAIRLY AND KNOWINGLY MADE" INQUIRIES NEW YORK LAW REQUIRES.**

### A. <u>Standard of Review</u>

This Court reviews a Rule 12(b)(6) dismissal de novo, "accept[ing] as true all factual allegations and draw[ing] from them all reasonable inferences" in the plaintiffs' favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). A release is "a species of contract" governed by principles of contract law, and the interpretation of an unambiguous release is a question of law this Court also reviews de novo. *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514-15 (2d Cir. 2001) (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985)). A release "must be construed in accordance with the intent of the parties who executed it," *id.* at 515, and where that intent is genuinely disputed it presents a triable issue,

14

defeating summary judgment there even after full discovery. *Id.* A fortiori, intent cannot be resolved against the pleader on a Rule 12(b)(6) motion, where all factual allegations are accepted as true and all reasonable inferences drawn in Appellants' favor. *Nielsen*, 746 F.3d at 62.

A release may reach unknown claims, including unknown fraud claims, but only "if the parties so intend and the agreement is 'fairly and knowingly made.'" *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 566-67 (1969)). That rule is not satisfied by breadth alone. Breadth is evidence of intent: in *Centro* the Court of Appeals read a broad release, together with the circumstances of sophisticated entities negotiating with eyes open, to reach unknown fraud claims. See 17 N.Y.3d at 276-78. The circumstances here run the other way, and the district court never weighed them. It treated the catch-all breadth of the 2000–2001 releases as conclusive and dismissed claims premised on allegedly concealed fraud without ever asking whether the releasors intended to surrender such claims or executed the releases with knowledge of them.

Appellants preserved the point below. Before the district court ruled, Appellants objected that Defendants sought a broad interpretation of the releases while resisting any discovery into their scope and validity, and requested limited discovery so the release issues could be resolved on "a complete evidentiary record."

15

ECF No. 220 at 1-2, 12-13 (JA470 to JA471, JA481 to JA482). The court neither granted that discovery nor identified any record establishing intent; it inferred intent from boilerplate breadth. Because the governing inquiries are fact-bound and were resolved, if at all, against Appellants on the pleadings, reversal is required.

**B.** **A General Release Bars Unknown Fraud Claims Only Where the Release Was Fairly and Knowingly Made and the Parties So Intended, Inquiries the Release's Breadth Informs but Does Not Answer.**

Broad language is relevant to intent, but it is not conclusive. A release reaches unknown fraud claims only where it was "fairly and knowingly made" and the parties "so intend[ed]," *Centro*, 17 N.Y.3d at 276, and in *Centro* itself the Court found that intent in the release's broad terms read together with the circumstances. *Id.* at 276-78. *Centro*'s second, independent ground was justifiable reliance: a releasor who "has the means available to him of knowing . . . the truth . . . must make use of those means." *Id.* at 278-79 (quoting *DDJ Mgt., LLC v. Rhone Group L.L.C.*, 15 N.Y.3d 147, 154 (2010)). And *Centro* recognized that in certain circumstances a fiduciary's disclosure obligations might "operate like a written representation that no material facts are undisclosed" and so "satisfy a principal's obligation to investigate further." *Id.* at 279. Here the means of knowing were not available: the facts were held by the government actors who supplied the official cause determination and, as alleged, suppressed the evidence contradicting it. Where the complaint alleges that the releasees affirmatively concealed the very facts the later claim rests on, the fair-and-

16

knowing inquiry cannot be resolved against the pleader on the face of the release. See *infra* Parts I.B, I.E.

New York law has long refused to give general-release language mechanical effect. In *Mangini*, the Court of Appeals held that whether a general release covers a particular claim "turns on a matter of intention developable, dehors the instrument," and that "the literal language should not be determinative of the ultimate result or be applied mechanically." 24 N.Y.2d at 563. Releases "contain standardized, even ritualistic, language," *id.* at 562, and a court may not convert such language into a bar without the intent inquiry the doctrine requires. Whether a release was "fairly and knowingly made" and whether the parties intended it to reach a given claim are questions of fact where the record does not conclusively resolve them. *Id.* at 568.

These principles are independent of breadth. A catch-all phrase such as "arising out of, or in any way related to" the loss of the aircraft does not itself supply the intent and knowledge the doctrine demands, and the district court erred in reading it as though it did. That was legal error, and because it disposed of the case on the pleadings, it is error this Court reviews de novo.

17

**C. The Complaint Does Not Establish, at the Pleading Stage, That the Releases Were Fairly and Knowingly Made as to The Concealed Cover-Up.**

*Centro* itself shows why the fair-and-knowing inquiry defeats dismissal here rather than compelling it. There, the Court of Appeals enforced the release because the plaintiffs knew the very informational gap they were settling around: they "knew that defendants had not supplied them with the financial information necessary to properly value the TWE units, and that they were entitled to that information," yet "chose to cash out their interests and release defendants from fraud claims without demanding either access to the information or assurances as to its accuracy . . . ." *Id.* at 279. The Appellate Division made the same observation: the plaintiffs entered the transaction "well aware that defendants had not given them access to the internal financial records of Conecel." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 76 A.D.3d 310, 320 (1st Dep't 2010), *aff'd*, 17 N.Y.3d 269 (2011). Having negotiated "an extraordinarily broad release with their eyes wide open," the *Centro* plaintiffs could not later "invalidate that release by claiming ignorance of the depth" of the misconduct within the subject they knew they had not investigated. 17 N.Y.3d at 278.

The allegations here differ materially. The complaint does not allege that Appellants knowingly settled around a disclosed informational gap. It alleges that the families were affirmatively told that missile evidence did not exist, and that

18

material evidence, including the Navy radar tapes the government placed "out of the NTSB's reach," was concealed, removed, or altered and remained inaccessible for decades after the releases were signed. (JA105, JA113 to JA114). Those were not bargaining risks knowingly accepted; on the complaint's allegations they were facts the alleged cover-up prevented the families from knowing at all. A release is not "fairly and knowingly made" as to facts the releasor had no meaningful way to discover because they were suppressed by the very actors whose conduct is later challenged.

The parties' relative sophistication further distinguishes Centro and Bellefonte. The *Centro* court emphasized that no "grave injustice" arose from enforcement because the releasors were "highly sophisticated and well-counseled business organizations" who granted the release "as part of a deal in which they were paid $64 million and made a handsome profit." 76 A.D.3d at 316 n.4; *see Centro*, 17 N.Y.3d at 276. The *Bellefonte* releasors were likewise "experienced corporate executives, advised and assisted by sophisticated counsel," who ended an existing dispute in "clear and unambiguous language of remarkable breadth." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 526-27 (2d Cir. 1985) (quoting *Bellefonte Reinsurance Co. v. Argonaut Ins. Co.*, 581 F. Supp. 241, 242, 244 (S.D.N.Y. 1984)). Appellants are not commercial parties who profited from a negotiated buyout with counsel in an adversarial posture; they are families who

accepted compensation for the deaths of relatives against the backdrop of the government's official fuel-tank narrative.

The point is not that unsophisticated releasors may always avoid their releases. It is that the fair-and-knowing inquiry is sensitive to exactly these circumstances, and that *Mangini*'s solicitude arose in an analogous setting, the release of unknown injuries, where "experience, and sophisticated awareness are almost always with the releasee." 24 N.Y.2d at 568. Whether these releases were fairly and knowingly made as to a concealed cover-up is, at a minimum, a question the record does not resolve against Appellants on the pleadings.

That conclusion is reinforced by this very litigation's history. On the same concealment allegations, the District of Massachusetts held that Appellants' claims should be transferred rather than dismissed, finding the discovery-rule tolling theory sufficiently meritorious that transfer "would not be futile," and expressly declining to reach a "final determination on the accrual date." *Krick v. Raytheon Co.*, 695 F. Supp. 3d 202, 219-20 (D. Mass. 2023). That court applied the discovery-rule analysis to the Contractor Defendants, Raytheon and Lockheed Martin, rejecting the argument that a contractor must personally have concealed evidence before the doctrine can apply. The Massachusetts ruling addressed limitations, not the releases, and we cite it as persuasive and analogical only; as the district court observed, Judge Kelley decided only whether "interests of justice warrant transfer," 822 F. Supp. 3d

20

at 325 n.17 (SPA25), but the concealment allegations she credited are the same ones that make the fair-and-knowing inquiry a factual one here.

Barrett provides a useful analogy involving an allegedly concealed cause of death and a release whose validity could not be resolved on summary judgment. In *Barrett*, the estate alleged that the defendants intended it to believe the decedent died of natural causes during ordinary clinical treatment while knowing the estate was unaware of the government's involvement and perpetuating that misunderstanding to secure a more favorable settlement. The court held that it was "precluded from determining whether the release was obtained through fraud" on summary judgment, and applied the Second Circuit's concealment reasoning, although articulated in the accrual context, to the release-fraud question directly. *Barrett v. United States*, 622 F. Supp. 574, 584-85 (S.D.N.Y. 1985) (discussing *Barrett v. United States*, 689 F.2d 324, 329-30 (2d Cir. 1982)). A fortiori the question cannot be resolved on the pleadings. The circumstances are sufficiently analogous to reinforce the need for a factual record.

21

### D. The Complaint Alleges Fraud Separate from the Subject of the Releases.

*Centro* supplies the operative test: "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release." 17 N.Y.3d at 276 (citing *Bellefonte*, 757 F.2d at 527-28). *Bellefonte* distinguished the authorities the plaintiffs there relied on, explaining that "those cases involved circumstances in which the settlement or release had been part of the very transaction attacked as fraudulently induced, or other circumstances in which it was clear that no semblance of a fraud claim had come to light before the claim at issue was settled and it was clear that the parties had not intended to settle fraud claims." 757 F.2d at 528. This case falls squarely in the second category.

The *Centro* and *Bellefonte* releasors lost because their alleged fraud was the same fraud they had settled. In *Centro*, the fraud "falls squarely within the scope of the release" because it was the identical valuation dispute that produced the release. 17 N.Y.3d at 277. In *Bellefonte*, the plaintiffs alleged "no new misrepresentations in connection with the negotiation and execution of the settlement agreements," but only "the same omission that underlies plaintiffs' suit to rescind the reinsurance contracts." 757 F.2d at 526. New York and this Court treat that as the decisive question, whether the wrong that produced the settled litigation and the wrong later complained of are the same wrong. *Bellefonte* traced that principle to *Alleghany*,

22

which it described as establishing that a fraud claim may be settled with finality even absent full pre-settlement disclosure. *See id.* at 527-28; *Alleghany Corp. v. Kirby*, 333 F.2d 327, 334 (2d Cir. 1964), *aff'd on reh'g en banc by an equally divided court*, 340 F.2d 311 (2d Cir. 1965), *cert. dismissed sub nom. Holt v. Alleghany Corp.*, 384 U.S. 28 (1966). *Centro* makes identification of a separate fraud a necessary condition of any challenge to a release. The question on these pleadings is whether Appellants have identified one, not whether breadth alone forecloses the inquiry.

This case is on the other side of that line, and *Bellefonte* itself identified the case that marks it. Citing *Irving Trust Co. v. Deutsch*, this Court placed on that side the case in which the later claim had not come to light at all when the release was signed. In *Irving Trust* itself, the corporation "had never made any claim against him on account of the stock," "no intention to relinquish such a claim can be found," and, because the released party stood in a fiduciary relation to the corporation, "the general release cannot be held to include this transaction without a full and frank disclosure by Deutsch of the circumstances." *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 126 (2d Cir. 1934). *Irving Trust* turned on that fiduciary duty of disclosure; Appellants invoke it as illustration, for the narrower point that a general release is not read to surrender a claim no one knew existed and no disclosure brought to light. So too here: the complaint alleges that no missile-strike or evidence-suppression claim had come to light when the releases were signed in 2000-2001, that the

23

concealment was ongoing, and that Appellants first learned of it in 2021. (JA113 to JA115).

Appellants allege that government actors who controlled material evidence supplied an official internal-malfunction explanation while withholding evidence supporting a contrary theory. That is not "the same omission" settled in *Bellefonte*; it is a new and separate fraud, an affirmatively false narrative that stood outside the released claims and concealed their existence. The claims it concealed are precisely the unknown claims that *Bellefonte* described *Irving Trust* as leaving unreached. At the pleading stage, with all inferences drawn in Appellants' favor, the complaint pleads "a separate fraud from the subject of the release" under *Centro*'s own test, 17 N.Y.3d at 276. The district court was required to test the complaint against that standard, not against the releases' generality alone.

### E. The District Court Never Decided the Scope-And-Intent Questions *Mangini* Requires as to the Alleged Cover-Up.

Before a release may be enforced, a court must determine what the parties intended it to cover, a question *Mangini* holds is not answered by literal breadth. The releasor bears the burden of showing that general language "does not represent the intent of the parties," 24 N.Y.2d at 563, but that burden is factual, and standardized language "should not be determinative of the ultimate result or be applied mechanically" where the releasors are "entitled to prove, directly or circumstantially, that there was no intention to release" the claim at issue. *Id.* at 563, 569. Where, as

24

here, the release is challenged on the ground of fraud, the burden of persuasion remains with the releasee. *Id.* at 563. The district court resolved neither scope question.

First, as to the scope of the releasee definition: the releases purport to reach "all individuals, entities or corporations, whether specifically named or not," and define releasees to include entities "not specifically identified" who "are or may be liable to Releasors in whole or in part for any and/or all damages and losses to Releasors, whether known or unknown, arising out of or in any way related to or resulting from the loss of TWA Flight 800." (ECF No. 187-3 at 2-3 (JA316 to JA317)). The court treated that catch-all as conclusively evidencing an intent to release the present defendants, without asking whether such standardized language was actually intended to discharge entities whose alleged connection to Appellants' injuries, a role in a decades-long course of concealment, was itself unknown and concealed when the releases were signed. That is precisely the "standardized, even ritualistic" language *Mangini* warns cannot be applied mechanically to defeat a factual dispute over intent. 24 N.Y.2d at 562.

Second, as to the cover-up itself: the court moved directly from the release language to the conclusion that the claims were barred, without asking whether the parties, in 2000-2001, intended "the Event" to reach a course of evidence suppression that was not then known, not then disputed, and, on the complaint's

25

allegations, still being actively perpetrated when Appellants learned of it in 2021. *Mangini* recognized that "the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form," *id.* at 562, and where the record does not conclusively establish intent that question cannot be resolved on the papers, *id.* at 568. The district court's failure to ask either question, rather than its answering either one wrongly, is itself error requiring reversal, particularly where Appellants sought and were denied the discovery that would develop the intent record. ECF No. 220 at 1-2, 12-13 (JA470 to JA471, JA481 to JA482).

### F. The Releases' No-Reliance Disclaimer Does Not Bar the Claims at the Pleading Stage.

The district court held that paragraph 9, in which releasors stated they did "not rely on any statement or representation made by any Releasee . . . concerning . . . [t]he cause or causes for the Event; or . . . [t]he legal liability of any Releasee," "clearly forecloses the plaintiffs' claim that the defendants fraudulently concealed the true cause of the TWA 800 crash." 822 F. Supp. 3d at 325 (SPA24) (quoting ECF No. 187-3 ¶ 9 (JA319)). That was error at the Rule 12 stage, for three reasons.

First, a disclaimer of reliance bars a fraud claim under New York law only where it is a specific disclaimer that tracks the very representation alleged to be false, not a general or boilerplate recital. A "general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter the contract by means of

26

fraud," and only where "the contract states that a contracting party disclaims the existence of or reliance upon specified representations" will that party "not be allowed to claim that he was defrauded." *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (1959)). "[T]he touchstone is specificity." *Id.* at 316. More importantly, *Yanakas* resolved the question on scope: the guarantee there did "not purport to waive any defenses to its own validity," and that, not the label on the form, controlled. *Id.* at 317. Paragraph 9 is likewise subject-specific, and Appellants take it as written: it disclaims reliance on "statement[s] or representation[s]" by a Releasee concerning "[t]he cause or causes for the Event" and "[t]he legal liability of any Releasee."

Two questions follow that the district court never separately analyzed: whether the alleged physical removal, withholding, and concealment of evidence was a "statement or representation" at all, and whether the decades-long Coverup was a subject distinct from "the cause or causes for the Event." 822 F. Supp. 3d at 324-25 (SPA24 to SPA25). Whatever Paragraph 9 forecloses as to representations about the cause of the Event, it does not in terms reach the suppression the complaint alleges. *Yanakas* also identified the markers of a "generalized boilerplate exclusion": a preprinted form, one the drafter used routinely, with no evidence that its "scope or character . . . was the product of any negotiations between the parties." *Yanakas*, 7 F.3d at 317. Whether the 2000–2001 releases bear those markers is a further factual

question the pleadings do not resolve against Appellants. *Cf. DDJ Mgt., LLC v. Rhone Group L.L.C.*, 15 N.Y.3d 147, 154 (2010) (reversing dismissal under CPLR 3211; "Where . . . a plaintiff has taken reasonable steps to protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred").

The District of Massachusetts, crediting these same allegations before transfer, observed precisely that: "After a thorough investigation by a number of agencies, the government told Plaintiffs the only possible cause of the crash was an explosion of flammable vapors in the plane's center fuel tank," and "[i]t is reasonable that Plaintiffs trusted and believed that federal agencies and law enforcement such as the CIA, FBI, NTSB, and NTSB Office of Families were providing truthful information and competent advice." *Krick*, 695 F. Supp. 3d at 214. "It is reasonable," that court added, "for the obligation to engage in further due diligence or investigation to end there." *Id.* That court addressed limitations rather than the releases, and it is persuasive only, but it answers in analogous terms the question paragraph 9 poses: whether these families' reliance on the official narrative was unreasonable cannot be resolved against them as a matter of law.

Here the complaint alleges the families were affirmatively told that missile evidence did not exist and that the dispositive evidence, including the Navy radar tapes the government placed "out of the NTSB's reach," SAC ¶ 40 (JA105), was

28

suppressed and kept inaccessible for decades. A releasor cannot be charged, on the pleadings, with a knowing disclaimer of reliance as to a cause of death the releasees' own concealment made undiscoverable.

Second, *Centro* confirms the point rather than defeating it. The disclaimer defense prevailed in *Centro* because the releasors "knew that defendants had not supplied them with the financial information necessary to properly value the TWE units, and that they were entitled to that information," yet released their claims anyway. 17 N.Y.3d at 279. The releasors here are on the opposite side of that line: on the complaint's allegations they did not know of, and had no means to discover, the concealed missile cause. The transfer court found it "convincing" that "the 10 years of FOIA litigation that Dr. Stalcup engaged in to unearth the new evidence used as a basis of this Amended Complaint" belied the United States' contention that the information was "readily available," *Krick*, 695 F. Supp. 3d at 218, and concluded that "[e]ven assuming arguendo that allegations of a missile strike were sufficiently well documented to the extent to trigger a duty to inquire, a 'reasonably diligent investigation' would still not have revealed the necessary factual predicate for their claim before the accrual date." *Id.* at 215 (citing *McIntyre v. United States*, 367 F.3d 38, 52, 55 (1st Cir. 2004)). Whether a disclaimer was fairly and knowingly made as to a fact the releasee actively concealed is, at a minimum, a question the pleadings do not resolve against the pleader.

29

Third, a disclaimer procured by the same concealment cannot insulate that concealment. Where the complaint alleges that the entire release, its disclaimer included, was obtained while the releasees perpetuated a false internal-malfunction narrative, the disclaimer is part of the instrument attacked as fraudulently induced, not an independent bar to the attack. *See Centro*, 17 N.Y.3d at 276 (release challengeable where the challenger "can identify a separate fraud from the subject of the release"). The authority the district court invoked does not compel a contrary result at the pleading stage: *Moore v. Cohen*, 548 F. Supp. 3d 330, 343 (S.D.N.Y. 2021), enforced an explicit disclaimer against a sophisticated participant who disclaimed reliance on representations he knew had been made, not a family told that the very cause of a relative's death did not exist.

## II. THE RELEASES' UNKNOWN-CLAIMS AND SUBSEQUENTLY-DISCOVERED-FACTS LANGUAGE DOES NOT ESTABLISH, AT THE PLEADING STAGE, AN INTENT TO RELEASE THE CONCEALED FRAUD.

The district court also read paragraph 8, in which releasors "contemplat[ed] the possibility that facts may be subsequently discovered," agreed the release would not be "subject to any claim of mistake of fact," and "waive[d] any rights or benefits . . . with respect to unknown or unsuspected claims," as language of "remarkable breadth" that "makes clear the parties' intent to release all claims, including those of fraudulent inducement." 822 F. Supp. 3d at 324 (SPA23) (quoting ECF No. 187-3 ¶

30

8 (JA318)). The court again inferred intent from the breadth of the language without considering the pleaded circumstances surrounding execution.

A clause assuming the risk that known facts may prove different is not a knowing release of a claim for the fraud that made the facts unknowable. Paragraph 8 allocates the ordinary risk that a shared understanding of a known subject might later shift; it does not, on its face, reflect a decision to surrender claims arising from the releasees' active concealment of the subject itself. New York draws exactly this line: a release "may encompass unknown claims, including unknown fraud claims," but only "if the parties so intend and the agreement is 'fairly and knowingly made.'" *Centro*, 17 N.Y.3d at 276 (quoting *Mangini*, 24 N.Y.2d at 566-67). Standardized unknown-claims language does not itself supply that intent, it is the "standardized, even ritualistic" language *Mangini* holds "should not be determinative of the ultimate result or be applied mechanically." 24 N.Y.2d at 562-63.

*Mangini* is directly on point. Even against a general release of unknown claims, the releasor is "entitled to prove, directly or circumstantially, that there was no intention to release" the claim at issue. *Id.* at 569. Whether these releasors, told in 2000-2001 that no missile evidence existed, intended their unknown-claims waiver to reach a decades-long concealment they first learned of in 2021 is a question of fact the pleadings do not resolve. The district court's contrary conclusion drew intent from the instrument's breadth alone, the precise error *Mangini* forbids.

31

Those authorities recognize an exception for fraud separate from the subject of the release. Both hold that broad unknown-claims language reaches even undisclosed fraud, "even if the defrauding party has an independent duty to disclose, and even when the release was executed without knowledge of certain specific frauds," with a single exception: "a separate and distinct fraud from that contemplated by the agreement." *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 190-91 (S.D.N.Y. 2008) (quoting *DIRECTV Grp., Inc. v. Darlene Invs., LLC*, No. 05 Civ. 5819, 2006 WL 2773024, at *4 (S.D.N.Y. Sept. 27, 2006)); *see Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 364 (S.D.N.Y. 2022) (enforcing unknown-claims language against sophisticated parties who "knew how to create a fraud exception when they wanted to"). The complaint plausibly places this case within that exception. Unlike the commercial releasors in *Consorcio* and *Wade Park*, the families do not seek to reopen the settled subject; they allege a separate and distinct fraud, the concealment of a missile strike and the suppression of evidence, that was not the wrongful-death dispute the 2000–2001 settlements resolved, for the reasons stated in Part I.C. Whether that fraud is "separate and distinct from that contemplated by the agreement" is, on these allegations, a question that cannot be resolved against the pleader on a motion to dismiss.

32

## III. THE DISTRICT COURT ERRED IN AFFIRMING THE ORDER PERMITTING APPELLANTS' COUNSEL TO WITHDRAW.

### A. Standard of Review.

This Court reviews a ruling on a motion to withdraw as counsel for abuse of discretion. *Whiting v. Lacara*, 187 F.3d 317, 320 (2d Cir. 1999). A court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). Whether a matter referred to a magistrate judge is dispositive, and so what standard of review the district court owed it, is a question of law. *See Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008).

### B. The Withdrawal Motion was Dispositive in Practical Effect, and the District Court Reviewed It Under The Wrong Standard.

The magistrate judge treated the motion to withdraw as a non-dispositive pretrial matter. The district court agreed, holding that "the decision to permit an attorney to withdraw is non-dispositive and discretionary," and reviewed the order only for clear error under Federal Rule of Civil Procedure 72(a), a standard it described as "highly deferential" and as imposing "a heavy burden on the objecting party." SPA31.

That was error. The categories of dispositive matters in 28 U.S.C. § 636(b)(1)(A) are not exhaustive, and where a party contends that a district court "erroneously treated a matter referred to a magistrate judge as 'not dispositive' and

33

thus failed to review de novo the decision by a magistrate judge in that matter," the inquiry is into "the practical effect of the challenged action on the instant litigation." *Beemiller*, 527 F.3d at 265. An order is dispositive when it is "functionally equivalent" to an order of dismissal. *Id. Beemiller* applied that inquiry to a remand order, holding that a motion to remand is not a "pretrial matter" under § 636(b)(1)(A). *Id.* at 265-66. The framework it adopted is not confined to remand: the Court agreed that the statute's list of dispositive matters is "non-exhaustive," *id.* at 265, and the courts whose approach it endorsed applied the same test outside the remand setting. *See Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 5-6 (1st Cir. 1999) (discovery sanctions); *Rajaratnam v. Moyer*, 47 F.3d 922, 923-24 (7th Cir. 1995) (denial of attorney's fees).

On this record the practical effect was not in doubt, because the magistrate judge stated it himself. At the August 22, 2024 conference he advised Appellants that he was "inclined to grant th[e] motion[ to withdraw]," and that "[w]hen that happens, the plaintiffs need to keep in mind that their claims may inherently be extinguished." SPA34. A magistrate judge who tells unrepresented litigants that granting a motion may extinguish their claims has described a matter that is functionally equivalent to a dismissal. Whatever the general rule for withdrawal motions, the order entered here was reviewable de novo, and applying clear-error review to it was an error of law.

34

### C. The Order Permitted Withdrawal Without the Showing Local Civil Rule 1.4 Requires as to the Posture of the Case.

Local Civil Rule 1.4 conditions withdrawal on "a showing by affidavit or otherwise of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar." SPA32 (quoting Local Civ. R. 1.4). The rule is conjunctive. Satisfactory reasons alone do not suffice; the court must also weigh where the case stands. This Court has recognized the same consideration, noting that in addressing motions to withdraw "district courts have typically considered whether 'the prosecution of the suit is [likely to be] disrupted by the withdrawal of counsel.'" *Whiting*, 187 F.3d at 320-21.

The posture finding here was that withdrawal "will not adversely affect the timing of the proceedings" because, although a briefing schedule had been set, "neither dispositive motion practice nor discovery have begun." SPA29. That finding rests on an incomplete view of the record. Two months before the motion was filed, at the June 24, 2024 conference, counsel for the government previewed for the court precisely the defense that would later end the case: that "all of [the defendants' motions] will share in common the issue that the plaintiffs released everybody from any possible suit known or unknown in the future in signing these releases," and that "[p]laintiffs' counsel is well aware of it." SPA28 n.3.

The case was therefore not at a stage where nothing had begun. It was on the threshold of the dispositive motions that in fact terminated it, on a defense that had

35

already been identified on the record. A court weighing "the posture of the case" as Rule 1.4 directs was required to weigh that. Treating the absence of a filed motion as the absence of dispositive motion practice mistook the docket for the posture.

### D. <u>The Withdrawal Caused Continuing Prejudice that Substitute Appellate Counsel Did Not Cure.</u>

The withdrawal took effect on October 8, 2024. SPA29. Successor counsel appeared on October 21, 2024, but "solely and strictly" to appeal the withdrawal order. SPA30. Present counsel later appeared to protect Appellants' rights and prosecute this appeal, but they did not replace the withdrawing attorneys as a mass-tort litigation team responsible for scientific discovery, expert development, products-liability proof, and trial preparation. If the judgment is reversed, Appellants will return to the district court without the specialized counsel who undertook the case.

The resulting prejudice is prospective as well as historical. The withdrawal may make qualified replacement counsel more difficult to obtain because prospective mass-tort lawyers may infer, correctly or not, that prior counsel found the claims unworthy or the clients unusually difficult to represent. Present counsel's appearance does not eliminate that practical consequence or the need to determine whether withdrawal was justified in light of the case's posture and specialized demands.

**E. Effective Relief Remains Available Because the Withdrawal Order Will Govern the Litigation On Remand.**

The challenge is not moot. Appellants seek reinstatement of an action that, if remanded, will proceed into discovery, expert development, and trial preparation. Vacatur and remand would permit the district court to reinstate withdrawing counsel, require a sufficient evidentiary showing, impose conditions protecting Appellants during any transition, or defer withdrawal until appropriately qualified replacement counsel is obtained. Those remedies would have immediate practical significance.

On remand, the withdrawing attorneys should be required to establish satisfactory reasons for withdrawal and address the posture of the litigation, the clients' ability to obtain qualified mass-tort counsel, the prejudice withdrawal would cause during discovery and trial preparation, and whether conditions short of withdrawal could protect counsel's legitimate interests. Local Civil Rule 1.4 does not permit withdrawal merely because continued litigation has become difficult or inconsistent with counsel's preferred strategy; its separate posture requirement protects clients from being left without suitable counsel when continued representation is most consequential.

**F. The Errors Are Not Cured by the Forfeiture Findings.**

The district court declined to reach several of Appellants' objections on the ground that they had not been raised before the magistrate judge. SPA33; SPA35 n.10. That Appellants consulted other counsel is not a "satisfactory reason" for

withdrawal within the meaning of Local Civil Rule 1.4, and it bears not at all on the posture of the case, which the rule separately requires the court to weigh. SPA35. That disposition does not reach the two errors identified above. Appellants expressly asked the district court to review the withdrawal order de novo, arguing that the motion was "a dispositive matter requiring de novo review," and the court reached and rejected that argument on its merits. SPA31. The standard-of-review objection was therefore preserved. In any event, Rule 72(a) required the district court, on Appellants' timely objections, to "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Nor can a finding that "neither dispositive motion practice nor discovery have begun" be insulated by forfeiture, because it is the affirmative finding on which the Rule 1.4 posture element was resolved.

For these reasons, the November 20, 2024 order should be vacated and the matter remanded for review of the withdrawal order under the correct standard and with the posture of the case properly considered.

**IV.  THE DISMISSAL ON THE STANDING GROUND CANNOT STAND AS ENTERED, BECAUSE RULE 17(a)(3) FORBADE DISMISSAL BEFORE A REASONABLE TIME TO CURE AND THE DISMISSAL SHOULD IN ANY EVENT HAVE BEEN WITHOUT PREJUDICE.**

### A. Standard of Review.

Whether a defect is jurisdictional, and what disposition it permits, are questions of law this Court reviews de novo.

### B. The Defect the Court Identified Is One of Capacity and Real-Party-In-Interest Status, Not an Absence Of Article III Standing.

The court asked whether the complaint alleges that Appellants were appointed personal representatives and received letters of administration. 822 F. Supp. 3d at 316-17 (SPA10 to SPA12). That is a question of who may prosecute a claim, not whether a party with a concrete injury exists. This Court has held the two distinct: "there is a distinction between having standing to pursue a claim and being a real party in interest with respect to that claim." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021). And capacity "is non-jurisdictional in nature." *Id.* at 382. The label a district court uses does not convert a non-jurisdictional defect into a jurisdictional one. In Fund Liquidation the district court had held that a want of capacity meant there was "no subject-matter jurisdiction," and this Court vacated.

Fund Liquidation distinguishes capacity from legal existence, and holds that a plaintiff lacking legal existence at filing lacks Article III standing. *Id.* at 382. That

39

does not end the inquiry. The consequence the Court drew is stated directly: "Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time. Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed." *Id.* at 386.

The district court answered the estate-reopening fact with a timing rule, citing *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 68 (S.D.N.Y. 2013), for the proposition that "[a] plaintiff's standing is considered at the time the action was commenced." SPA12 n.11. *Fund Liquidation* supplies the answer: the time-of-filing question is whether a party with standing to prosecute the claim existed when the pleading was filed, and if that party "is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time." *Id.* at 386. An appointment that issues afterward is not a defect the time-of-filing rule forecloses; it is the cure the rule prescribes.

### C. Rule 17(a)(3) Forbade Dismissal Before a Reasonable Time to Cure, and Appellants Asked for That Time.

The rule is mandatory in terms. A court "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action," and after substitution "the action proceeds as if it had

40

been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3).

Substitution "should be liberally allowed when the change is merely formal and in

no way alters the original complaint's factual allegations as to the events or the

participants," and "there plainly should be no dismissal where 'substitution of the

real party in interest is necessary to avoid injustice.'" *Advanced Magnetics, Inc. v.*

*Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997).

Appellants invoked the rule below, arguing that the defects were "readily

curable under FRCP 17(a)(3)." 822 F. Supp. 3d at 317–18 (SPA12); ECF No. 196

at 21–22 (JA408 to JA409). The court recited that argument but did not decide

whether Appellants' pending efforts to obtain or restore representative authority

satisfied the rule, whether additional time was reasonable, or whether ratification,

joinder, or substitution could cure the identified defect. The record shows that cure

was under way rather than hypothetical: the order reopening Oliver Krick's estate

was signed on July 15, 2025, SPA12 n.11, and the remaining estate Appellants had

petitions pending. SPA12.

### D. At a Minimum, the Dismissal Should Have Been Without Prejudice.

A dismissal for want of Article III standing "must be without prejudice,"

because "Article III deprives federal courts of the power to dismiss a case with

prejudice." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54-55 (2d Cir. 2016)

(quoting *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999)).

41

*Carter* addressed dismissals for want of Article III standing; the further step is Appellants' submission: it would be anomalous if a defect that is not jurisdictional at all, and so implicates no limit on the court's adjudicative power, supported a dismissal of broader preclusive effect than one that is. Where a complaint has been dismissed for want of capacity to sue, this Court has reversed "with instructions to grant leave to file an amended complaint, in default of which a new order of dismissal may be entered." *Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 300 (2d Cir. 1965).

That conclusion does not depend on how New York characterises the defect. Even on the view that a duly appointed administrator is a condition precedent to a wrongful-death claim rather than a matter of capacity, the New York Court of Appeals has held, for purposes of CPLR 205(a), that the requirement "is in no way related to the merits of the underlying claim," so that "a dismissal due to the omission of this requirement must be regarded as a tangential matter not affecting the validity of the claim itself." *Carrick v. Cent. Gen. Hosp.*, 51 N.Y.2d 242, 252 (1980). *Carrick* construed CPLR 205(a); Appellants invoke its characterisation for the corresponding federal point: a defect tangential to the merits should not support a dismissal that bars the claim for all time.

The same disposition governs the five Appellants who sued only in their individual capacities. SPA13. Their wrongful-death and survivorship claims rest on

42

the representative-capacity rule addressed above. SPA13 (citing *Frometa v. Mar-Can Transp. Co.*, 72 Misc. 3d 316, 327 (N.Y. Sup. Ct. 2021)). Their remaining claims were dismissed because the complaint "does not allege any facts to support their negligence or product liability claims." SPA13. That is a pleading holding, not a jurisdictional one, and it supports at most a dismissal with leave to replead. *Klebanow*, 344 F.2d at 300.

Appellants therefore ask that the dismissal on the standing ground be vacated and the matter remanded with instructions to determine whether ratification, joinder, or substitution can cure the identified defect within a reasonable period under Rule 17(a)(3). At a minimum, the dismissal should be modified to be without prejudice.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the judgment and remand for further proceedings. Appellants further request that the Court vacate the November 20, 2024 order and direct the district court to reconsider the withdrawal request under the correct standard and Local Civil Rule 1.4, including the present and prospective prejudice to Appellants, the specialized demands of the litigation, and the availability of qualified replacement counsel. Withdrawing counsel should be reinstated unless they establish sufficient grounds for withdrawal on an adequate record and the district court determines that withdrawal can occur without materially prejudicing Appellants. The dismissal on the representative-capacity ground should also be vacated and remanded for the Rule 17(a)(3) determination described above or, at a minimum, modified to be without prejudice.

Dated:  August 4, 2026
         Medford, Oregon

Respectfully submitted,

 /s/ Thad M. Guyer
THAD M. GUYER
*Attorney for Plaintiffs-Appellants*
T.M. GUYER AND
AYER & FRIENDS, PC
P.O. Box 1061
Medford, Oregon 97501
(202) 227-3590
*thad@guyerayers.com*

44

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4)(A) because it contains 10,419 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), and does not exceed 14,000 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  August 4, 2026
       Medford, Oregon

                                   Respectfully submitted,

                                   */s/ Thad M. Guyer*
                                   THAD M. GUYER

## CERTIFICATE OF SERVICE

I certify that on August 4, 2026 I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the ACMS system. Service will be accomplished on all counsel of record by the Notice of Docket Activity generated by that system, all counsel of record being registered Filing Users. See 2d Cir. Local Rule 25.1(h).

Dated:  August 4, 2026
        Medford, Oregon

                                    Respectfully submitted,

                                       */s/ Thad M. Guyer*
                                      THAD M. GUYER