# No. 26-1225

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

RONALD KRICK, individually and on behalf of the Estate of Oliver Krick; MARGARETA KRICK; CHRISTOPHER KRICK; DOUGLAS KEVORKIAN, individually and on behalf of the Estate of Ralph Kevorkian; CHRISTINE GROGAN; EILEEN ZAHARIOUDAKIS, individually and behalf of the Estate of Donald Gough; MICHAEL DETERESA; CHARLES HENRY GRAY IV; CHADWICK GRAHAM GRAY; CRAIG GAETKE; WANDA KEMP, individually and on behalf of the Estates of O. Lamar Allen and Ashton Allen,

*Plaintiffs-Appellants*,

(*Caption continued on inside cover*)

On Appeal from the United States District Court
for the Eastern District of New York

**BRIEF FOR FEDERAL APPELLEES UNITED STATES MISSILE DEFENSE AGENCY; UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES NAVY; UNITED STATES OF AMERICA**

BRETT A. SHUMATE
*Assistant Attorney General*

JOSEPH NOCELLA, JR.
*United States Attorney*

CHARLES W. SCARBOROUGH
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*

LISA MICHELSON, individually and on behalf of the Estate of Yonatan Rojany; ERIC ROJANY; JODELLE GEARON, individually and on behalf of the Estate of Daniel Gaetke; TODD GAETKE,
*Plaintiffs*,

v.

RAYTHEON COMPANY; RAYTHEON TECHNOLOGIES CORPORATION; LOCKHEED MARTIN CORPORATION; UNITED STATES MISSILE DEFENSE AGENCY; UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES NAVY; UNITED STATES OF AMERICA,
*Defendants-Appellees*,

DOES 1 THROUGH 20,
*Defendant*.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE....................................................................2

A. Factual Background....................................................................2

B. Prior Litigation....................................................................4

C. District Court Proceedings....................................................................8

SUMMARY OF ARGUMENT.................................................................... 12

STANDARD OF REVIEW .................................................................... 14

ARGUMENT .................................................................... 14

I. The District Court Correctly Concluded that the Prior Settlement Agreements Release Plaintiffs' Claims in This Case .................................... 14

A. The Broad Settlement Releases Foreclose Any and All Future Claims by Plaintiffs Arising from the TWA Crash....................................14

B. Plaintiffs' Counterarguments Lack Merit....................................................18

II. In the Alternative, the District Court Correctly Concluded that Plaintiffs Failed to Establish that They Can Bring this Action on Behalf of the Estates .................................................................... 25

CONCLUSION .................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
106 F.3d 11 (2d Cir. 1997) ........ 29

*Air Crash Off Long Island on July 17, In re*,
209 F.3d 200 (2d Cir. 2000) ........ 4

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
757 F.2d 523 (2d Cir. 1985) ........ 23

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
952 N.E.2d 995 (N.Y. 2011) ........ 14, 17, 21, 23

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*,
790 F.3d 411 (2d Cir. 2015) ........ 26, 28

*Dekalb Cnty. Pension Fund v. Transocean Ltd.*,
817 F.3d 393 (2d Cir. 2016) ........ 28

*Del Re v. Prudential Lines, Inc.*,
669 F.2d 93 (2d Cir. 1982) ........ 29

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 29

*Frometa v. Mar-Can Transp. Co.*,
148 N.Y.S.3d 613 (Sup. Ct. 2021) ........ 27

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021) ........ 29

*General Motors Corp. v. Superior Ct.*,
15 Cal. Rptr. 2d 622 (Ct. App. 1993) ........ 15

*Greenfield v. Philles Recs., Inc.*,
780 N.E.2d 166 (N.Y. 2002) ........ 19

*Lahr v. NTSB*,
569 F.3d 964 (9th Cir. 2009) ........ 2, 3, 22

*Mangini v. McClurg*,
249 N.E.2d 386 (N.Y. 1969) ........ 20, 21

*Manufacturers Hanover Tr. Co. v. Yanakas*,
7 F.3d 310 (2d Cir. 1993) ........................................ 20, 22

*Muto v. CBS Corp.*,
668 F.3d 53 (2d Cir. 2012) ........................................ 14

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
442 P.2d 641 (Cal. 1968) ........................................ 19

*Palladino v. Metropolitan Life Ins. Co.*,
590 N.Y.S.2d 601 (App. Div. 1992) ........................................ 26

*Shelley v. South Shore Healthcare*,
999 N.Y.S.2d 103 (App. Div. 2014) ........................................ 27, 29

*Tripathy v. McKoy*,
103 F.4th 106 (2d Cir. 2024), *cert. denied*,
No. 24-229, 2026 WL 1871310 (U.S. June 30, 2026) ........................................ 18

*United States v. O'Connor*,
650 F.3d 839 (2d Cir. 2011) ........................................ 24

*United States v. Sanders*,
17 F. Supp. 2d 141 (E.D.N.Y. 1998) ........................................ 22

*Williams v. Beemiller, Inc.*,
527 F.3d 259 (2d Cir. 2008) ........................................ 25

**Statutes:**

Federal Tort Claims Act:
28 U.S.C. § 1291 ........................................ 1
28 U.S.C. § 1346(b)(1) ........................................ 1, 8

28 U.S.C. § 636(b)(1)(A) ........................................ 24

46 U.S.C. § 30302 ........................................ 26

49 U.S.C. § 1111(g)(1) ........................................ 2

49 U.S.C. § 1131(a)(1)(A) ........................................ 2

49 U.S.C. § 1131(e) ........................................ 2

49 U.S.C. § 1132(a)(1)(A) ........................................................................................ 2

Cal. Civ. Code § 1638 .............................................................................................. 19

Cal. Civ. Code § 1639 .............................................................................................. 19

Cal. Civ. Proc. Code § 877(a) .................................................................................. 14

N.Y. Est. Powers & Trusts Law § 1-2.13 ................................................................ 26

N.Y. Est. Powers & Trusts Law § 5-4.1(1) ............................................................. 27

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ........................................................................................ 1

Fed. R. Civ. P. 17(a)(3) ............................................................................................ 28

E.D.N.Y. Local Civ. R. 1.4 ........................................................................................24

**Other Authorities:**

NTSB, *Aircraft Accident Report* (Aug. 23, 2000), https://perma.cc/Q2K5-STLV ......................................................................... 3

6A *Wright & Miller's Federal Practice & Procedure* § 1543 (3d ed. 2026) ......................................................................................................26

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), for their claims against the government. JA101. The district court granted the government's and the private defendants' motions to dismiss on March 2, 2026, and entered judgment on March 3, 2026. SPA26. Plaintiffs filed a timely notice of appeal on April 30, 2026. SPA37-38; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This case arises from the tragic explosion and crash of a commercial flight in 1996. In 1997, the estates of the decedents brought various claims against the airline and airplane manufacturers, and the estates later entered into settlement agreements releasing "any and all" past, present, and future claims, "whether known or unknown," that "aris[e] out of" or "in any way relate[] to" the crash. JA316-17. Plaintiffs are relatives of the decedents who question the federal government's official conclusion after a lengthy investigation that the accident was likely caused by the ignition of flammable vapors in the plane's fuel tank. Plaintiffs allege that the true cause of the explosion was a missile that struck the plane, which they contend the government has concealed. They brought claims for wrongful death and negligence against the government based on asserted harms to the estates, and the district court dismissed on two independent bases. The questions presented with respect to the federal appellees are:

1. Whether the district court correctly dismissed plaintiffs' claims as barred by the signed settlement releases.

2. Whether, in the alternative, the district court properly dismissed plaintiffs' claims for failure to establish their authority to pursue claims on behalf of the estates.

## STATEMENT OF THE CASE

### A. Factual Background

This case arises from the crash of a Boeing 747 airliner operating as Trans World Airlines (TWA) Flight 800. The flight headed to Paris, France, took off from New York's John F. Kennedy International airport on July 17, 1996, around 8:20 p.m. JA104. Shortly after takeoff, the plane exploded and crashed into the Atlantic Ocean off the coast of Long Island. JA99. All 230 passengers and crew members on board the flight died. JA99, 104.

Various federal agencies were involved in a comprehensive investigation into the crash. *See* JA104. The National Transportation Security Board (NTSB) was involved because it has statutory obligations to investigate and report on civil aviation accidents. *See* 49 U.S.C. §§ 1111(g)(1), 1131(a)(1)(A), (e), 1132(a)(1)(A). The Federal Bureau of Investigation (FBI) became involved because of potential criminal activity. *See Lahr v. NTSB*, 569 F.3d 964, 969 (9th Cir. 2009) ("The possibility that a bomb or missile destroyed TWA Flight 800 led the FBI to launch a criminal investigation into the incident."). "The FBI also enlisted the assistance" of weapons analysts at the Central Intelligence Agency (CIA) to help assess whether eyewitness accounts of

"something arcing toward" the plane supported a theory that a missile caused the crash. JA104-05; *see Lahr*, 569 F.3d at 969 (noting that the FBI asked the CIA to assist "in determining what the eyewitnesses actually saw").

The CIA prepared a video entitled "What Did The Eyewitnesses See?" that "was displayed during a nationally televised FBI press conference" in 1997. JA106. That video indicated that the plane was not "struck by a missile" or other projectile. JA106-07. The CIA determined that what observers perceived as a "streak of light" rising upward was in fact the burning aircraft itself. JA104.

Following the NTSB's investigation and consideration of nearly 3,000 documents, the agency in 2000 released a 300-page report "stating that the likely cause of the crash was an explosion of flammable vapors in the plane's center fuel tank." JA107; *see Lahr*, 569 F.3d at 969-70 (reciting conclusion that "the explosion was most likely initiated by a short circuit"). The NTSB determined that the internal explosion caused part of the plane's fuselage to detach and propelled the remainder of the already-ablaze plane to climb higher and erupt in a fireball before falling into the ocean. NTSB, *Aircraft Accident Report* 262-64 (Aug. 23, 2000), https://perma.cc/Q2K5-STLV. The NTSB found that physical evidence did not support a missile strike, *see id.* at 257-59, and that witnesses likely "observed some part of the in-flight fire and breakup sequence," *id.* at 264; *see also Lahr*, 569 F.3d at 969-71 (summarizing the NTSB's investigation and findings).

Plaintiffs in this case allege that the government covered up the true cause of the crash. According to plaintiffs, "the FBI essentially froze the NTSB out of the investigation," including by "remov[ing] all copies (original and duplicates) of Navy radar tapes" and by "refus[ing] to allow the NTSB to conduct eyewitness interviews or review the FBI's records." JA105. Plaintiffs aver that the FBI "threatened" several "[e]yewitnesses who were interviewed," JA105; that "the CIA concocted materials to discredit eyewitnesses," JA106; and that the NTSB failed to follow "usual procedure for NTSB aviation crash reports" and omitted "crucial evidence that ran counter to its conclusion," JA108. The complaint also alleges that a newly formed NTSB office "successfully deceived the victims' families" about the crash "[t]hrough a series of misleading official communications." JA108. In plaintiffs' view, documentary evidence and deposition testimony "reveals that TWA 800 was brought down by a missile and the government hid this truth from . . . the public at large." JA113-14.

### B. Prior Litigation

After the TWA Flight 800 crash, relatives and estate representatives of deceased passengers and crew members brought suits in district courts around the country against the airline and airplane manufacturers. *In re Air Crash Off Long Island on July 17, 1996*, 209 F.3d 200, 201 (2d Cir. 2000). Those cases were transferred and consolidated for pretrial proceedings in the district court for the Southern District of New York. *Id.* The plaintiffs ultimately resolved "all personal injury and wrongful

death claims arising from the loss of TWA Flight 800" pursuant to settlement agreements. JA311; *see* SPA13.

The estates of each of the decedents in this case executed releases of "all claims by or on behalf of the estate or the beneficiaries" and stipulated to dismissal with prejudice. JA291-310. The agreements were signed by individuals who "represent[ed] and warrant[ed]" that they had authority "to execute [the] release on behalf of Decedent's Estate and all heirs thereto." JA316, 325, 334, 350, 359, 380, 452, 460. In many cases, plaintiffs who purport to represent the estates in this litigation personally signed the agreements. *See* JA321-22 (Ronald, Margareta, and Christopher Krick); JA348 (Christine Grogan); JA365 (Eileen Zaharioudakis); JA386 (Douglas Kevorkian); *see also* JA458, 466 (Charles and Chadwick Gray).

Except where otherwise noted, the agreements are materially identical. In exchange for the payment of a specific sum, the plaintiffs "release[d] and forever discharge[d] any and all actions, causes of action, suits, debts, dues, sums of money, accounts, . . . claims, and demands whatsoever, in law, admiralty or equity," that they "ever had, now have or hereafter can, shall or may have, for, upon, by reason of, arising out of, or in any way related to" the "loss of TWA Flight 800." JA316-17. That language encompasses wrongful-death, personal-injury, and other claims stemming from "injury to or death of Decedent," whether asserted "by Decedent's heirs, beneficiaries, dependents, or personal representative, or by anyone else." JA317. The agreements "expressly extend[] to and include[]," among other things,

"each and every claim or cause of action that could have been asserted for all past and future economic damages, noneconomic damages and awards recoverable or potentially recoverable from any person." JA317.

The plaintiffs stated that they "intend [the agreements] to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent." JA317. The plaintiffs "represent[ed] and warrant[ed]" that the agreements would "dispose of all liability" to the signing individuals and to "all heirs and dependents of Decedent not otherwise identified, and their successors and assigns, that might now or in the future assert a claim." JA317-18. The plaintiffs further indicated that "they intend to release fully all individuals, entities or corporations, whether specifically named or not, that might be liable for damages arising out of the injury to or death of Decedent." JA317.

By their terms, the agreements encompass claims against the airline, the airplane manufacturers, and "all other persons and entities not specifically identified who are or may be liable" for damages and losses, "whether known or unknown, arising out of or in any way related to or resulting from the loss of TWA Flight 800." JA316. One of the agreements explicitly recites that "any and all agencies, departments, and subdivisions of the GOVERNMENT OF THE UNITED STATES OF AMERICA" are among the entities subject to release. JA380. The plaintiffs "agree that they will not, directly or indirectly, make or cause to be made any

further action against" anyone "for losses, damages or injuries arising out of the injury to or death of Decedent." JA317.

In entering the agreements, the plaintiffs acknowledged that "facts concerning their claims may be found hereafter to be other than or different from the facts they now believe to be true" and that "facts may be subsequently discovered that could support claims as yet unasserted." JA318-19. The plaintiffs "expressly accept[ed] and assume[d] the risk of any such possible differences in facts and agree[d] that this [agreement] shall remain in full effect notwithstanding any such difference in facts." JA319. In addition to waiving any legally protected rights "with respect to unknown or unsuspected claims," the plaintiffs stated that they "intend to discharge . . . all liability for all losses, injuries or damages arising out of the injury to or death of Decedent, both those now known and those that may be subsequently discovered." JA318-19. The plaintiffs further disclaimed "rel[iance] on any statement or representation made" about "[t]he cause or causes for the [crash]" or "[t]he legal liability . . . for the losses, injuries or damages." JA319.

The written documents "contain[] the entire agreement and understanding of the parties." JA320. The terms "are contractual in nature" and "may not be changed orally." JA320. Apart from one agreement that selects California law, JA384, the choice-of-law clauses uniformly provide that the agreement is to "be construed and governed under the laws of the State of New York," JA320. Before signing, the plaintiffs had to acknowledge that they "carefully read and fully underst[ood]" the

provisions of the agreement. JA320. The agreements further indicated that the plaintiffs "EXPRESSLY CONFIRM THAT THEY HAVE CONSULTED WITH THEIR ATTORNEYS CONCERNING THIS RELEASE AND HAVE BEEN FULLY ADVISED WITH RESPECT TO THEIR RIGHTS AND OBLIGATIONS." JA320.

### C. District Court Proceedings

Plaintiffs are nine individuals who are related to decedents of the TWA Flight 800 crash. *See* SPA5 n.4 (outlining relationships between plaintiffs and decedents).[1] Four of those plaintiffs purport to bring this action "individually and as personal representative on behalf of the Estate" of their respective family members. JA101-02. As relevant here, plaintiffs brought Federal Tort Claims Act claims for wrongful death and negligence against the United States. *See* JA116-27.[2] Plaintiffs alleged that the government "worked closely with" defendants Raytheon and

---

[1] There were four additional plaintiffs who voluntarily dismissed their claims and are no longer involved in this litigation. *See* SPA6. Charles and Chadwick Gray, who are listed as appellants in the caption, are not properly part of this case because they "were not included as plaintiffs in the [operative] second amended complaint." SPA5 n.5. Amending the complaint to add these individuals "would be futile" in any event because their claims are subject to dismissal on the same grounds as the claims by the proper plaintiffs. SPA18 n.13.

[2] An earlier complaint asserted claims against federal agencies and subcomponents, *see* JA65, rather than "against the United States," 28 U.S.C. § 1346(b)(1). The operative complaint rectified that error by listing the United States as defendant and omitting the agencies and subcomponents. *See* JA103. The U.S. Missile Defense Agency, the U.S. Department of Defense, and the U.S. Navy should thus be omitted from the caption.

Lockheed Martin "in conducting the missile testing that caused the crash" and was "otherwise responsible for the decision to test missiles in the area." JA120-21, 126-27. After the case was transferred from the District of Massachusetts to the Eastern District of New York, the government and the private defendants each moved to dismiss. *See* SPA5-6.

The district court granted the motions to dismiss on two independent bases. The court determined that the settlement releases, which were subject to judicial notice given that plaintiffs did "not dispute [their] authenticity," clearly apply to "the parties and claims in this case." SPA16-17. The court explained that, by their terms, the agreements "unambiguously bind not only the personal representatives who signed the releases, but all beneficiaries." SPA19. The agreements "also cover unnamed entities" like "the defendants in this action" who plaintiffs allege "are liable for damages 'arising out of or in any way related to or resulting from the loss of TWA Flight 800.'" SPA20 (quoting JA316).

The district court concluded that "the releases bar the claims the plaintiffs bring here." SPA20. The court emphasized that "plaintiffs signed general releases that broadly apply to 'any and all actions . . . arising out of, or in any way related to the' TWA 800 crash." SPA25 (alteration in original) (quoting JA317). The express language of the agreements "contemplates the possibility that information may be subsequently discovered related to liability for the crash, and that the facts may turn out to be different than those that were known at the time the releases were signed."

SPA23. The agreements "also contain unequivocal disclaimers" memorializing that plaintiffs did not rely on "statements or representations" about the factual cause of, or the legal liability for, the crash. SPA24. The court characterized plaintiffs' cited cases as "readily distinguishable" because, unlike here, the agreements at issue "did not 'clearly evidence' the intent to release liability." SPA23 n.16.

In addition, the district court concluded that plaintiffs failed to establish under either New York or federal law that they are the real parties in interest who can bring claims on behalf of the relevant estates that they purport to represent.[3] As the court explained, New York law and a federal maritime statute require that a plaintiff be "duly appointed" as a "personal representative" to sue "on behalf of a decedent." SPA10 (quotation marks omitted). The complaint's conclusory assertion that four plaintiffs qualify as "personal representative[s]" of the respective estates was not supported by allegations "that a court appointed these plaintiffs as personal representatives." SPA11. Court filings further "reveal[ed] that almost all of the estates were closed by the early 2000s," and plaintiffs did "not allege that the estates were reopened." SPA12.

The wrongful-death and negligence claims that plaintiffs purported to bring "in their individual capacities" suffered from similar deficiencies. The district court

[3] Although the district court couched this determination in Article III standing terms, *see* SPA8-9, it is best understood as a determination that plaintiffs lack authority to sue. In any event, the label does not affect the ultimate disposition because the court correctly held that plaintiffs failed to meet the necessary prerequisites.

explained that, under applicable case law, "[o]nly administrators of an estate" can "pursue causes of action for wrongful death or claims based on pain and suffering under survivorship," but plaintiffs identified no well-pleaded allegation that they are "administrators of the estates." SPA13 (alterations and quotation marks omitted). And the court reasoned that the negligence claims failed to allege "how the plaintiffs were personally injured" separate and apart from the claimed wrongful deaths of their family members. SPA13.

Plaintiffs did "not dispute that the complaint lacks sufficient allegations about their appointment as personal representatives," but rather sought an opportunity to cure the defect. SPA12. Plaintiffs claimed that one estate "was never closed," another estate "was reopened" several years after they filed the complaint, and "the remaining estate plaintiffs have filed petitions to reopen the estates." SPA12. The district court declined to "wait to see" if plaintiffs could later fix the issue, particularly given plaintiffs' burden to establish their ability to sue at the outset of the litigation. *See* SPA12 & n.11. And the court stressed that, "[e]ven assuming that the plaintiffs could cure these deficiencies," dismissal was appropriate because the settlement agreements "bar the plaintiffs' claims in this action." SPA12.

The district court accordingly dismissed all of plaintiffs' claims. SPA26. Because the grounds identified by the court were dispositive, the court did not need to reach "the defendants' other arguments" for dismissal. SPA25 n.18.

## SUMMARY OF ARGUMENT

This case involves claims of the estates of decedents who were aboard TWA Flight 800 that crashed into the Atlantic Ocean in 1996. Represented by experienced counsel, the estates negotiated global resolutions of all past, present, and future claims arising from or related to the crash, and they signed settlement agreements in 2000 and 2001 releasing all such claims. Notwithstanding those broad releases, plaintiffs in this case seek to bring claims on behalf of the same estates based on their theories about the cause of the crash. The district court properly rejected this duplicative litigation on multiple grounds, dismissing the wrongful-death and negligence claims against the federal government on two independent bases, either of which is sufficient to affirm.

First, the district court correctly concluded that the settlement releases entered in the prior litigation bar plaintiffs' claims here. By their express terms, those releases bind the estates and all of the decedents' heirs and beneficiaries, including plaintiffs here. The releases likewise apply to named and unnamed individuals and entities who may be liable for damages or losses resulting from the crash. To achieve a final and complete resolution, the releases broadly encompass any and all past, present, and future claims, whether known or unknown, that arise out of or in any way relate to the crash. At every turn, the agreements signal the parties' intent to fully release any wrongful-death, negligence, or other claim that could be asserted in the future.

Plaintiffs largely attempt to sidestep the language of the prior settlements that carefully delineates the scope of what the parties agreed to. Plaintiffs cannot override the clear and unambiguous terms of the releases by alluding to extraneous evidence of contrary intent. Nor do plaintiffs' repeated references to an alleged government cover-up of the true cause of the accident affect the analysis. In the agreements, plaintiffs waived their rights to bring a future lawsuit even if subsequent evidence were discovered that changed their understanding of the facts. Plaintiffs specifically disclaimed that they relied on any representations about the factual cause of, or the legal liability for, the crash in voluntarily deciding to enter the agreements. Plaintiffs cannot now raise claims that they expressly renounced as part of the settlement.

Second, the district court correctly dismissed plaintiffs' claims because plaintiffs failed to allege that they have the authority to pursue claims on behalf of the estates. Plaintiffs do not dispute that they did not obtain court orders reopening the estates and appointing them as personal representatives of the estates before commencing this action. Rather, plaintiffs argue solely that the district court was required to provide further opportunity to cure this recognized defect. No authority supports plaintiffs' approach of filing a complaint with a concededly improper plaintiff and then moving to fix the issue after the fact. The court acted well within its discretion in dismissing the case without waiting to see whether plaintiffs could later satisfy the necessary prerequisites.

## STANDARD OF REVIEW

This Court reviews the district court's ruling on the motions to dismiss de novo. *Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012).

## ARGUMENT

### I. The District Court Correctly Concluded that the Prior Settlement Agreements Release Plaintiffs' Claims in This Case

#### A. The Broad Settlement Releases Foreclose Any and All Future Claims by Plaintiffs Arising from the TWA Crash

The signed settlement releases in the prior multidistrict litigation plainly encompass the parties and claims in this case. Where "the language of a release is clear and unambiguous," it is "binding on the parties" and operates as "a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011) (quotation marks omitted); *see also* Cal. Civ. Proc. Code § 877(a) (providing that a release "given in good faith . . . to one or more of a number of tortfeasors claimed to be liable for the same tort" discharges "part[ies] from liability" to the extent that "its terms so provide"). Here, the written releases are remarkably broad and unequivocal.

To settle litigation over the TWA Flight 800 crash, the estates of each of the decedents in this case executed releases of "all claims by or on behalf of the estate or the beneficiaries" and stipulated to dismissal with prejudice. JA291-310. The releases "dispose of all liability" not only as to the individuals who signed the agreements, but also as to "all heirs and dependents of Decedent not otherwise identified, and their

successors and assigns, that might now or in the future assert a claim." JA317-18; *see* JA317 (referring to claims "assertable by Decedent's heirs, beneficiaries, dependents, or personal representative, or by anyone else"). Thus, the signatory had to "represent and warrant" the authority "to execute [the] release on behalf of Decedent's Estate and all heirs thereto." JA316. The majority of plaintiffs in this case personally signed the agreements and were expressly named as releasors. *See* JA316, 321-22, 343, 348, 359, 365, 380, 386; *see also* JA452, 458, 466.

The releases unmistakably include the government. *See* SPA20. The agreements define the releasees as including the airline, airplane manufacturers, and "all other persons and entities not specifically identified who are or may be liable" for damages and losses, "whether known or unknown, arising out of or in any way related to or resulting from the loss of TWA Flight 800." JA316. Although that language is sufficient on its own, the agreements go even further, making clear that the parties "intend to release fully all individuals, entities or corporations, whether specifically named or not, that might be liable for damages arising out of the injury to or death of Decedent." JA317. And while California law permits discharge even when an entity is "not specifically named or identified in the release," *General Motors Corp. v. Superior Ct.*, 15 Cal. Rptr. 2d 622, 624 (Ct. App. 1993), the California agreement eliminates any doubt by explicitly reciting that "any and all agencies, departments, and subdivisions of the GOVERNMENT OF THE UNITED STATES OF AMERICA" are among the released entities, JA380.

As the district court recognized, the wrongful-death and negligence claims that plaintiffs seek to pursue here fall squarely within the reach of the settlement releases. *See* SPA22-25. In exchange for the payment of a specific sum, plaintiffs "release[d] and forever discharge[d] any and all actions, causes of action, suits, debts, dues, sums of money, accounts, . . . claims, and demands whatsoever, in law, admiralty or equity," that they "ever had, now have or hereafter can, shall or may have, for, upon, by reason of, arising out of, or in any way related to" the "loss of TWA Flight 800." JA316-17. That language speaks in capacious terms, covering "any and all" claims "whatsoever" plaintiffs "ever had, now have or hereafter . . . have" that "aris[e] out of" or "in any way relate[] to" the crash. And the agreement goes on to confirm that the release "extends to and includes, but is not limited to, each and every claim or cause of action that could have been asserted for all past and future" damages "potentially recoverable from any person." JA317. Indeed, the agreement singles out "claims for wrongful death, survival, survivorship, [or] personal injuries" of the sort that plaintiffs wish to bring here. JA317.

Plaintiffs err (Br. 22-24) multiple times over in attempting to recast their wrongful-death and negligence claims as fraud claims that are outside the bounds of the release. As an initial matter, plaintiffs did not assert freestanding fraud claims in their operative complaint; the complaint mentions fraud only in connection with arguments about the statute of limitations. *See* JA115-16. But even accepting their dubious characterization, courts have held that materially identical release language

encompasses fraud claims. In *Centro*, for example, the New York Court of Appeals recognized that "[t]he phrase 'all manner of actions,' in conjunction with the reference to 'future' and 'contingent' actions, indicates an intent to release defendants from fraud claims . . . unknown at the time of contract." 952 N.E.2d at 1000. The contractual language in this case sweeps at least as broadly. If anything, the parties' intent here is even more apparent because the agreements explicitly encompass both "known or unknown" losses, JA316, and waive any legally protected rights "with respect to unknown or unsuspected claims," JA319.

Throughout the agreements, the parties provided for a complete and definitive resolution of any possible liability associated with the crash. Plaintiffs stated that they "intend this [r]elease to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent." JA317. In another portion of the agreement, plaintiffs again expressed that they "intend to discharge . . . all liability for all losses, injuries or damages arising out of the injury to or death of Decedent, both those now known and those that may be subsequently discovered." JA318. And plaintiffs promised that "they will not, directly or indirectly, make or cause to be made any further action against" anyone "for losses, damages or injuries arising out of the injury to or death of Decedent." JA317. If this agreement were deemed susceptible to exceptions, it is difficult to imagine how any "party could ever settle a fraud claim with any finality." *Centro*, 952 N.E.2d at 1000.

Plaintiffs, moreover, understood that their acceptance of the agreements was not premised on any specific understanding of the facts. Plaintiffs acknowledged that they may not be privy to all of the facts and that reality may differ from what "they now believe to be true." JA318-19. They "expressly accept[ed] and assume[d] the risk" that their view of the facts was mistaken, and they "agree[d] that this [r]elease shall remain in full effect" anyway. JA319; *see also* JA318-19 ("This [r]elease shall not be subject to any claim of mistake of fact or law by Releasors."). Even more pointedly, the releases "contain unequivocal disclaimers" memorializing that plaintiffs' willingness to enter the agreements was not reliant on "statements or representations" about the factual cause of, or the legal liability for, the crash. SPA24 (citing JA319). However plaintiffs may now seek to characterize their claims in this case, they were plainly released as part of the settlement of prior litigation over the crash.

### B. Plaintiffs' Counterarguments Lack Merit

Plaintiffs largely ignore the broad, preclusive language in the signed settlement agreements. They do not even purport to identify any real ambiguity in the scope of the releases. Nor do they dispute that the releases are authentic and validly executed, or that the district court properly considered them as part of its analysis. *See* SPA17-18 (ruling that judicial notice was warranted); *see also Tripathy v. McKoy*, 103 F.4th 106, 118 (2d Cir. 2024) (holding that appellants forfeit arguments not developed in their opening brief), *cert. denied*, No. 24-229, 2026 WL 1871310 (U.S. June 30, 2026).

Instead, plaintiffs offer a hodgepodge of contentions for why they should be allowed to circumvent the binding releases. None has merit.

The main thrust of plaintiffs' counterargument is that the district court erred in focusing on the written instruments themselves. As the court correctly recognized, *see* SPA18-19, it is well settled under governing state law that "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous," *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002); *see* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit . . . ."); *id.* § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ."). Put another way, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 780 N.E.2d at 170; *see Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 645 (Cal. 1968) (holding that extrinsic evidence may not be used to "vary the terms of a written contract").

Because the settlement agreements are not ambiguous, plaintiffs' arguments falter on this preliminary ground. Despite their professed focus on intent, plaintiffs overlook the numerous mentions of intent in the agreements. The agreements declare in no uncertain terms that plaintiffs "intend this [r]elease to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent." JA317. Other examples abound. *See, e.g.*, JA317 (stating that

plaintiffs "intend to release fully all individuals, entities or corporations, whether specifically named or not, that might be liable for damages"); JA317-18 (stating that "[t]his [r]elease is intended to . . . dispose of all liability" to "all heirs and dependents"); JA318 (stating that plaintiffs "intend to discharge . . . all liability for all losses," "both those now known and those that may be subsequently discovered"). Those promises are central to the agreement that plaintiffs attest to have "carefully read and fully underst[ood]." JA320.

As noted, plaintiffs do not meaningfully seek to demonstrate lack of clarity in this language or any other pertinent contractual language. Rather, they simply assert (Br. 25-26) that the claims they seek to assert here should be excluded. But the cases plaintiffs rely upon emphasize that releases should not be lightly "converted into a starting point for renewed litigation." *Mangini v. McClurg*, 249 N.E.2d 386, 390 (N.Y. 1969). Yet under plaintiffs' approach, burdensome discovery would be necessary in any case where a plaintiff makes generic assertions about the parties' intent in the face of a release that is clear on its face. Releases would cease to serve their intended and essential function of precluding future litigation if they could be so easily evaded. *See id.* (describing releases as "a jural act of high significance without which the settlement of disputes would be rendered all but impossible").

Nor is this a case where the language in the settlement agreement consists of "a generalized boilerplate exclusion" with no accompanying disclaimer, *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 317 (2d Cir. 1993), or where the language is

"standardized" and "ritualistic," *Mangini*, 249 N.E.2d at 389. The releases here use highly "particular language" in the context of a "negotiated settlement" that evinces "a conscious and deliberate intention to discharge liability." *Id.* at 391. As plaintiffs acknowledge (Br. 22), a "party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release," *Centro*, 952 N.E.2d at 1000. Plaintiffs cannot satisfy that demanding standard because the fraud they allege falls well within the releases "that broadly apply to 'any and all actions . . . arising out of, or in any way related to the' TWA 800 crash." SPA25 (alteration in original) (quoting JA317).

Plaintiffs misapprehend (Br. 16-17) the inquiry in concentrating on what facts were available at the time that they signed the agreements. The relevant question instead turns on "the subject of the release." *Centro*, 952 N.E.2d at 1000. And here, plaintiffs not only released "any and all" past, present, and future claims, "whether known or unknown," against all entities that "aris[e] out of" or "in any way relate[] to" the crash, JA316-17, but also waived their rights to bring a future lawsuit even if facts were to "be subsequently discovered," JA318. Indeed, plaintiffs expressly affirmed that they "fully underst[ood] and acknowledge[d]" that the version of the facts they "believe[d] to be true" could turn out to be inaccurate, but they were content to "assume [that] risk" to settle their claims. JA318-19. In other words, the agreements specifically priced in (Br. 18) the possibility of an "informational gap" on plaintiffs' part. For similar reasons, the discussion in the Massachusetts district court's transfer

decision of when plaintiffs plausibly discovered their claims (Br. 20-21, 28-29) is inapposite. *See* SPA25 n.17.

Plaintiffs are likewise wrong (Br. 26-27) to downplay the significance of the provisions in the agreements "disclaim[ing] the existence of or reliance upon specified representations." *Yanakas*, 7 F.3d at 315. Plaintiffs' repeated refrain (Br. 30) that they were induced to enter the agreements on the basis of an allegedly "false internal-malfunction narrative" contradicts the language in the agreements providing that plaintiffs were not relying on representations about what caused the crash or who might be liable for resulting harms. *See* JA319 (disclaiming reliance on "any statement or representation" about the "cause or causes," or the "legal liability," for the crash). Furthermore, plaintiffs attempt (Br. 23) to elide the fact that theories about a missile strike had already "come to light when the releases were signed," including in the underlying multidistrict litigation. The crash received "national and international media attention," *Lahr v. NTSB*, 569 F.3d 964, 976 (9th Cir. 2009), and there was speculation that the government had engaged in a cover-up of the true cause of the accident, *see United States v. Sanders*, 17 F. Supp. 2d 141, 147 (E.D.N.Y. 1998). In fact, the government's own investigation examined statements from eyewitnesses who believed they saw a streak of light rising toward the plane. *See* JA105. Had plaintiffs' agreement been contingent on the reason for the crash, they "could have negotiated to include a specific warranty in the" settlement agreements to that effect. SPA25. Instead, they knowingly chose the opposite approach.

Plaintiffs also seek (Br. 19-20) to distinguish this case based on the "relative sophistication" of the parties, noting that other cases involved "commercial parties." But plaintiffs entirely overlook the meaningful similarities. Like the contracting parties in *Bellefonte Re Insurance Co. v. Argonaut Insurance Co.*, 757 F.2d 523 (2d Cir. 1985), plaintiffs were "advised and assisted by sophisticated counsel" known for handling major aviation cases, and they entered settlement releases with "clear and unambiguous language of remarkable breadth." *Id.* at 526 (quotation marks omitted). In capital letters, the agreements required plaintiffs to "expressly confirm that they have consulted with their attorneys concerning this release and have been fully advised with respect to their rights and obligations." JA320 (citation modified). Plaintiffs "cannot now invalidate" that "extraordinarily broad release," which was "negotiated and executed" on the advice of experienced counsel and with "eyes wide open," by claiming that they lacked a full appreciation of the facts when they bargained that away as part of the settlement. *Centro*, 952 N.E.2d at 1002.

Plaintiffs' arguments about the 2024 withdrawal of their original lawyers in this lawsuit (Br. 33-38) do not affect the outcome. Plaintiffs' original attorneys moved to withdraw because they had "reached an impasse" with their clients about "the viability of the case" in light of "the terms of the plaintiffs' previous settlement." SPA29 (quotation marks omitted). Plaintiffs had even started "relying on legal advice from an attorney in Oregon rather than their own counsel." SPA35 (quotation marks omitted). In addition, plaintiffs' lead attorney was "mov[ing] to a new law firm which

could not assume the representation." SPA28. The district court thus upheld the magistrate judge's conclusion that the attorneys had presented valid reasons to withdraw. SPA33. The magistrate judge granted several extensions to allow plaintiffs to retain other counsel, SPA28, and specifically found that withdrawal would "not adversely affect the timing of the proceedings" because "neither dispositive motion practice nor discovery ha[d] begun," SPA29 (quotation marks omitted).

Plaintiffs do not contest (Br. 35)—nor could they—that there were "satisfactory reasons for withdrawal" in this case. SPA32 (quoting E.D.N.Y. Local Civ. R. 1.4). After all, "the attorney-client relationship had broken down" on a "fundamental" issue about "the feasibility of continuing the litigation." SPA33. Plaintiffs instead contend (Br. 35-36) that the magistrate judge did not adequately consider "the posture of the case, including its position, if any, on the calendar." SPA32 (quoting E.D.N.Y. Local Civ. R. 1.4). But plaintiffs offer no support for this highly subjective contention. Notwithstanding plaintiffs' tangential observation (Br. 35-36) that the defendants had already previewed what arguments they planned to raise in forthcoming motions to dismiss, disruption of the proceedings was unlikely when those motions were not yet filed and discovery had not yet started, *see* SPA29. Plaintiffs have not come close to showing that granting the withdrawal motion was an abuse of discretion. *See United States v. O'Connor*, 650 F.3d 839, 851 (2d Cir. 2011).

Plaintiffs likewise lack support for their assertion (Br. 33-34) that this matter is dispositive for purposes of 28 U.S.C. § 636(b)(1)(A) such that the district court should

have reviewed the magistrate judge's ruling de novo. Unlike an order remanding a case to state court, an order allowing attorneys to withdraw from representation is not "functionally equivalent to an order of dismissal" that conclusively resolves whether the case can be heard in federal court. *Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008) (quotation marks omitted). The magistrate judge did not somehow convert the withdrawal request into a dispositive motion by indicating that plaintiffs' claims on behalf of the estates could be subject to dismissal if plaintiffs elected to proceed pro se. *See* SPA34. Moreover, the magistrate judge afforded ample time for plaintiffs to find new representation, *see* SPA28, and a new law firm initially "filed a limited notice of appearance" but subsequently "filed a notice of appearance in full representative capacity" to oppose the motions to dismiss (and to handle this ensuing appeal), SPA6 n.6. In all events, these issues are purely academic because the settlement releases unambiguously bar plaintiffs from pursuing the claims in this case.

## II. In the Alternative, the District Court Correctly Concluded that Plaintiffs Failed to Establish that They Can Bring this Action on Behalf of the Estates

If this Court upholds the district court's conclusion that the broad language in the prior settlement agreements bars plaintiffs' claims, it may affirm the judgment without reaching any other issue. But the court also properly dismissed on the independent ground that plaintiffs failed to allege that they are personal representatives who can pursue claims on behalf of the estates. There is no dispute that a legal action "must be brought by the person who, according to the governing

substantive law, is entitled to enforce the right." 6A *Wright & Miller's Federal Practice & Procedure* § 1543 (3d ed. 2026). The purpose of this prerequisite is to "ensure[] that only a person who possesses the right to enforce a claim and who has a significant interest in the litigation can bring the claim." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 420 (2d Cir. 2015) (alteration and quotation marks omitted).

Nor do plaintiffs take issue with the district court's recitation of the requirements under governing law. *See* SPA10, 13. New York law dictates that "[o]nly a duly appointed personal representative may bring suit on behalf of a decedent." *Palladino v. Metropolitan Life Ins. Co.*, 590 N.Y.S.2d 601, 602 (App. Div. 1992); *see* N.Y. Est. Powers & Trusts Law § 1-2.13 ("A personal representative is a person who has received letters to administer the estate of a decedent."). And a federal maritime statute provides that, "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas," "the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302.

These rules apply even to the extent that plaintiffs purport to sue for wrongful death and negligence in their individual capacities. As the complaint makes clear, plaintiffs seek to "vindicate the rights of those wrongly killed in the TWA 800 crash." JA100. For each of their claims, plaintiffs allege that their "decedents died after a missile downed TWA 800" due to "the negligent, grossly negligent, reckless, or

intentional conduct" of the defendants. JA117, 123. And plaintiffs claim that, as a result, they have "suffered damages and losses," such as "[l]oss of consortium," "mental anguish," and "Decedents' pain and suffering." JA122, 127.

The New York wrongful-death statute specifies that these kinds of claims "must be asserted by the personal representative appointed to administer [the estate]." *Frometa v. Mar-Can Transp. Co.*, 148 N.Y.S.3d 613, 623 (Sup. Ct. 2021); *see* N.Y. Est. Powers & Trusts Law § 5-4.1(1) (providing statutory cause of action "to recover damages for a wrongful act, neglect or default which caused [a] decedent's death" by the decedent's "duly appointed" personal representative "against a person who would have been liable to the decedent"). The same holds true for the sorts of derivative losses that plaintiffs allege stem directly from the crash. *See Shelley v. South Shore Healthcare*, 999 N.Y.S.2d 103, 104 (App. Div. 2014) (upholding dismissal of action brought by "the decedent's son" alleging "individually and on behalf of the decedent" that a nursing home had exhibited "negligence" and "gross negligence" because the son had not been appointed as the "personal representative," the "only party who is authorized to commence" such an action); *Frometa*, 148 N.Y.S.3d at 624 (explaining that the appointed personal administrator pursues any damages "for loss of consortium and loss of parental guidance" and "any claim based on pain and suffering under survivorship").

There is no dispute that the operative complaint contains no plausible allegations that plaintiffs have been validly appointed as the representatives of their

family members' estates. *See* SPA11-12. Without pleading any supporting facts, the complaint makes the conclusory allegation that certain plaintiffs qualify as "personal representative[s]." JA101-02; *see also* JA127 ("Personal representatives have been appointed for the decedents."). But court filings showed that, in some cases, other individuals had been appointed as personal representatives. SPA11. Moreover, "almost all of the estates were closed by the early 2000s," and plaintiffs did "not allege that the estates were reopened and that a court appointed new personal representatives." SPA12.

Plaintiffs offer no legal basis to ignore these critical deficiencies in their complaint. Rather, they insist (Br. 41) that the district court was obligated to credit their "pending efforts to obtain or restore representative authority." Plaintiffs invoke Federal Rule of Civil Procedure 17(a)(3), which states that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." This Court's precedent makes clear that the district court did not "abuse its discretion" in declining to afford plaintiffs further opportunity to cure the defect in a case that had already been pending for almost four years. *Cortlandt*, 790 F.3d at 425.

Rule 17(a)(3) is designed to "avoid forfeiture and injustice" when a litigant selects the wrong plaintiff based on "an *understandable mistake*" or "an *honest mistake*." *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 412 (2d Cir. 2016) (quotation

marks omitted). The rule's application is thus typically reserved for "situations in which it is unclear at the time the action is filed who had the right to sue and it is subsequently determined that the right belonged to a party other than the party that instituted the action." *Del Re v. Prudential Lines, Inc.*, 669 F.2d 93, 96 (2d Cir. 1982). By contrast, "where there was no semblance of any reasonable basis for the naming of an incorrect party," the district court retains "discretion to dismiss an action." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997).

This case readily falls into the latter camp. Plaintiffs have never defended their choice to proceed on behalf of closed estates without satisfying the requisite procedures. To the contrary, they assert that it was permissible for them to file a complaint naming concededly improper plaintiffs and to rectify the problem at some point later in the litigation. Plaintiffs read (Br. 39-40) portions of this Court's decision in *Fund Liquidation Holdings LLC v. Bank of America Corp.*, 991 F.3d 370 (2d Cir. 2021), out of context to authorize this maneuver. That reading would contravene the case law discussed above holding that courts are not required to allow plaintiffs to correct obvious errors after the fact. And, as the district court correctly observed, *see* SPA12 n.11, the law generally places a burden on plaintiffs to establish their right to sue when they initiate the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (recognizing that "[t]he requisite personal interest . . . must exist at the commencement of the litigation" (quotation marks omitted)); *Shelley*, 999 N.Y.S.2d at 104 (declining to extend time to serve complaint where "the plaintiff

lacked standing to sue in his representative capacity at the time he commenced the action").

Here, the district court had ample justification for declining to "wait to see" if plaintiffs could later remedy the issue that has been present since they initiated this action in June 2022. SPA12. From the outset, the complaint reflected that who "ha[d] been appointed" as "[p]ersonal representatives" of "the decedents" was relevant to the case. JA89. And defendants moved to dismiss on that ground in April 2025. SPA6. Despite their extensive notice of these deficiencies, plaintiffs reported that they had obtained only one order reopening one of the estates by the time of the district court's dismissal ruling in March 2026. SPA12 n.11. Particularly given the lack of explanation for plaintiffs' delay and the uncertainty about whether they would ever be appointed as personal representatives, the court had a sound basis to dismiss the case that had been pending almost four years. The court also reiterated that amendment would be futile in light of the signed settlement releases, which "bar the plaintiffs' claims in this action." SPA12.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

JOSEPH NOCELLA, JR.
*United States Attorney*

CHARLES W. SCARBOROUGH

*s/ Brian J. Springer*
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,725 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate ACMS system. Service will be accomplished by the appellate ACMS system.

*s/ Brian J. Springer*
Brian J. Springer